UNITED STATES of America, Plaintiff–Appellee,

v.

A. Reginald EAVES, Defendant–Appellant.

No. 88–8479.

United States Court of Appeals, Eleventh Circuit.

July 20, 1989.

See also, D.C., 685 F.Supp. 1243.

---

**944**

Charles R. Floyd, Jr., Thomas F. Jones, Floyd, Jones & Ware, Atlanta, Ga., for defendant-appellant.

William L. McKinnon, Jr., Asst. U.S. Atty., Atlanta, Ga., for plaintiff-appellee.

Before TJOFLAT and EDMONDSON, Circuit Judges, and ATKINS *, Senior District Judge.

ATKINS, Senior District Judge:

The defendant/appellant A. Reginald Eaves was a member of the Fulton County Board of Commissioners ("Board") elected in 1978 and sworn in as a Fulton County Commissioner in 1979. In October of 1987, Eaves was charged with four violations of the Hobbs Act. After a plea of not guilty, Eaves was tried and convicted on three of the four counts. He appeals from that conviction and asserts five separate grounds of error. We are persuaded by the appellant's argument that counts three and four were multiplicious and thus reverse his conviction on count four of the indictment. The remaining convictions are affirmed.

### FACTS

In early 1984, Special Agent Gary Morgan of the Federal Bureau of Investigation ("FBI") approached Charles Edward Wood ("Wood") about certain illegal activity in which Wood was allegedly involved. Wood offered to provide the FBI with information in exchange for immunity from prosecution.

Wood claimed that he had paid local public officials for votes and influence favorable to his pipeline and sewer business. He testified that during 1981 he paid Eaves $1,250.00 per month as a consultant for which Wood expected Eaves to help him obtain government contracts in the Atlanta area. After five or six months, Wood suspended payments because he believed the arrangement had not been profitable and told Albert Johnson, the former clerk of the Board, that any further business with Eaves would involve specific payments for specific work. Wood testified that in July of 1982, he paid Eaves $2,000 to push the Fulton County Public Works Department to approve plans for a subdivision for which Wood was providing the pipeline and sewer work, and that in August of that same year, he paid Eaves $2,500 to accelerate the recordation of a subdivision plat. Based upon this information, the FBI began an investigation into corruption of public officials which resulted in the indictment and conviction of Reginald Eaves.

The FBI used Wood and his business as the catalyst for its investigation. It provided WDH, a partnership formed by Wood, John Dedicher, and Clifford Hornsby, with office space and a telephone. Agent Clifford Cormany was relocated to Atlanta where he assumed the identity of a fictitious investor by the name of Steve Hawkins. Cormany, as Hawkins, accompanied Wood and Hornsby and observed their day to day activities to document any corrupt business dealings in which Wood might become involved while conducting his affairs.

When the FBI began its investigation, Wood and Hornsby had an option to purchase a piece of property which was zoned for agricultural use. The property ("Peters Pond project") was owned by the Bar-

* Honorable C. Clyde Atkins, Senior U.S. District Judge for the Southern District of Florida, sitting by designation.

nett Bank in Jacksonville, Florida. The FBI subsidized the first of three payments to extend the option on the land in 1984, and WDH made two in 1985. Wood forwarded these payments from Atlanta to the bank in Jacksonville. Wood and Hornsby planned to rezone and develop the property and approached Al Johnson to solicit his aid. In April of 1985, Wood asked Johnson to contact Eaves and ask for his help.

Johnson met with Reginald Eaves on April 16, 1985, and discussed the need for his vote on the Peters Pond project. Johnson testified that Eaves committed his vote for rezoning the land at that meeting. On May 1, the Board deferred the vote. On June 4, the day before the vote was scheduled, Johnson again met privately with Eaves and asked him how much money he required for a favorable vote. Johnson testified that Eaves held up his hand to demonstrate the number five and nodded in the affirmative when Johnson asked, "$5,000?" On June 5, the Board approved rezoning the Peters Pond project subject to submission of a new petition requesting zoning for single family homes in lieu of the suggested apartment dwellings. On June 19, Al Johnson paid Eaves $5,000 in cash. On September 4, the Board reconsidered the Peters Pond project pursuant to the new petition and granted rezoning.

On August 15, 1985, Agent Cormany, as Steve Hawkins, lunched with Eaves and Johnson. "Hawkins" represented to Eaves that he, "Hawkins," spoke for a number of investors who were scattered throughout the country. He was interested in developing land in the Atlanta area and wanted Eaves to help him with any zoning problems. "Hawkins" testified that Eaves acknowledged that he understood and was willing to cooperate.

In July of 1986, Eaves and "Hawkins" again met. "Hawkins" stated that he wished to develop a certain piece of property ("Fox Road Property") at the highest density possible and suggested to Eaves that money was available for his vote. They did not communicate from December of 1986 until late March of the following year. On April 6, 1987, "Hawkins" filed a petition to rezone the Fox Road property from agricultural to R–5 use, the highest density classification. The planning department of Fulton County and the planning commission both recommended denial. Eaves urged "Hawkins" to meet with the commissioners so that rezoning would not look like "a straight payoff." On June 3, the vote on the Fox road project was delayed. Thereafter, "Hawkins" reached a compromise with the community and the planning staff by which they agreed to an R–4 classification.

On August 3, 1987, Eaves told "Hawkins" that for $30,000 "to split" he would have his R–5 classification for the Fox Road property. "Hawkins" agreed and on August 5, when the Fox Road property came before the Board, Eaves moved that it be granted as submitted and voted in favor of an R–5 zoning classification.

Eaves and "Hawkins" met in a suite at the Hyatt Regency Hotel in Atlanta on August 11, 1987, where he offered partial payment in the amount of ten thousand dollars. Eaves refused telling "Hawkins" to keep the money until he had the entire thirty thousand. Later in the day, Eaves changed his mind and accepted the ten thousand. On September 4, "Hawkins" paid Eaves the remainder of the agreed upon amount.

Eaves was indicted on four counts which alleged separate violations of the Hobbs Act, 18 U.S.C. § 1951(a). Count I charged that Eaves accepted a $5,000 payment from Charles Wood. Count II alleged that Eaves accepted an $8,000 payment from Agent Cormany as Hawkins on July 2, 1985. Count III charged Eaves with accepting a $10,000 payment from "Hawkins" on August 11, 1987, and Count IV charged Eaves with accepting $20,000 on September 4. Eaves was tried and convicted on Counts I, III, and IV.

Eaves challenges his conviction on five distinct grounds. He contends that the government failed to establish an impact on interstate commerce, an essential element of a Hobbs Act violation, and thus the district court should have dismissed the

indictment. Eaves also challenges the district court's additional charge on interstate commerce given to the jury on the third day of its deliberations. Eaves asserts that he was the victim of wrongful and insidious selective prosecution and that limitations on his counsel's examination of witnesses prevented him from presenting a full and adequate defense. Finally, Eaves argues, persuasively, that counts III and IV were multiplicious.

## IMPACT ON INTERSTATE COMMERCE

"Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do ..." violates the Hobbs Act. 18 U.S.C. § 1951(a). The indictment charged the appellant with extortion and attempted extortion in each count. At the close of the evidence, the trial court granted the motion for judgment of acquittal on the substantive violation charged in counts III and IV but denied the motion in its entirety as it related to count I and for the attempt charged in counts III and IV.

The broad language of the Hobbs Act manifests an intention "to use all the constitutional power Congress has to punish interference with interstate commerce...." *Stirone v. United States,* 361 U.S. 212, 215, 80 S.Ct. 270, 272, 4 L.Ed.2d 252 (1960). In count I, Eaves was convicted of a substantive violation of the Hobbs Act which is generally supported by evidence of an actual effect on interstate commerce. *See, e.g., United States v. Janotti,* 673 F.2d 578, 591 (3d Cir.1982) (citing *United States v. Mazzei,* 521 F.2d 639, 642 (3d Cir.1982) (en banc)). The effect need be only *de minimis* to sustain the exercise of jurisdiction, *see, e.g., United States v. Tuchow,* 768 F.2d 855, 870 (7th Cir.1985); *United States v. Sorrow,* 732 F.2d 176, 180 (11th Cir.1984), and the facts before this court demonstrate the requisite element for conviction of the substantive offense charged in count I.

■ The government relied upon the fact that Charles Wood and Clifford Hornsby, as WDH Developers, were engaged in the business of land development. The $5,000 payment to Eaves insured his support for the rezoning petition filed by WDH which Wood and his partner intended to be the first step in development of the Peters Pond project. Before, during, and after the payoff, WDH sent option payments for the purchase of the property from Atlanta, Georgia, to a bank in Jacksonville, Florida. Although the $15,000 payment was provided by the FBI, the payments in the amount of $10,000 and $25,000 were made by WDH. The fact of the FBI's involvement, however, does not negate the fact of jurisdiction. *See, e.g., United States v. Holmes,* 767 F.2d 820, 824 (11th Cir.1985) (FBI represented a fictional business entity); *United States v. Rindone,* 631 F.2d 491, 493 (7th Cir.1980) (FBI supplied payoff money). The movement of the money in interstate commerce sufficed as a jurisdictional prerequisite.

■ The appellant stresses that the lack of potential for an impact on interstate commerce is even more apparent in the context of counts III and IV. Counts III and IV charged the inchoate offense of an attempt to violate the Hobbs Act. The appellant argues that every aspect of the Fox Road project was a pretense; the FBI did not even use a private entity as part of its scheme and thus there was no possibility of a project at all and no possibility of a project which would affect interstate commerce. This argument has been soundly rejected and we follow suit. *See, e.g., United States v. Holmes,* 767 F.2d at 824 ("The fact that the FBI undercover agent represented a fictitious business entity is not a defense to an extortion charge.") (citing *United States v. Brooklier,* 685 F.2d 1208, 1217 (9th Cir.1982) (though FBI business establishment was a fiction, jurisdiction sustained for Hobbs Act violation); *United States v. Janotti,* 673 F.2d at 592–94; *United States v. Smith,* 749 F.2d 1568, 1569 (11th Cir.1985) (per curiam) (fact of government agent's disguise as "real" victim no obstacle to jurisdiction)).

## MULTIPLICITY

■ The district court erred when it refused to dismiss either count III or IV of

the indictment. The evidence offered in support of those charges demonstrated that only one transaction formed the basis for both charges. The government created multiple charges by manipulating the logistics of the payments. We reverse the appellant's conviction on count IV.

The concept of multiplicity arises from charging a single offense in more than one count. *See, e.g., Ward v. United States,* 694 F.2d 654, 661–62 (11th Cir.1983) (citations omitted). The Supreme court's articulation of this concept in the seminal case of *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), distinguished between those offenses which by their nature are continuous and those which are committed *uno actu.* " '[W]hen the impulse is single, but one indictment lies, no matter how long the action may continue. If successive impulses are separately given, even though all unite in swelling a common stream of action, separate indictments lie.' " 284 U.S. at 302, 52 S.Ct. at 181 (quoting Wharton's Criminal Law, § 34).

A conviction for extortion under the Hobbs Act requires that (1) the defendant induced his victim to part consensually with property (2) either through the wrongful use of actual or threatened force, violence or fear or under color of official right (3) in such a way to adversely affect interstate commerce. *United States v. Smalley,* 754 F.2d 944, 947 (11th Cir.1985) (citations omitted). "Each relinquishment of property manifesting all these elements is a separate offense that may be the subject of a separate count." *Id.* (citation omitted). Relying on this proposition, the government argues that each installment of the agreed upon payment for the favorable vote contained all of the elements of a Hobbs Act violation and thus was properly the subject of two counts charged in the indictment.

We disagree. The crime for which the appellant was charged in counts III and IV was one in which the impulse was single. Although Eaves accepted two payments, they were, in fact, two parts of a whole. The circumstances before this court are easily distinguishable from those cases in which each of many acts forwards a single underlying purpose. *See, e.g., United States v. Tolub,* 309 F.2d 286, 289 (2d Cir. 1962) (each acceptance of payment by defendant during continuance of the same underlying conditions was a separate act of extortion). The payments at issue in this case were "installments of a lump sum." *See id.*

Even a cursory review of the record reveals the fact that the division of the agreed upon amount into two separate payments was at the behest of the government and for its convenience. Charging more than one violation under the facts that form the basis of counts III and IV would give the government unfettered discretion to determine how many crimes with which to charge a defendant by manipulating the methods of payment. The facts before this court demonstrate unequivocally that counts III and IV charged the same offense and were multiplicitous. Therefore the appellant's conviction for count IV of the indictment is reversed.

After a thorough review of the record, we decline to address the appellant's remaining contentions of error. Thus, consistent with the opinion of this court, the appellant's conviction on count IV of the indictment is REVERSED. The remaining convictions are AFFIRMED.