**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Ruby Mae DAVIS, aka Red Ruby, Mary Helen Davis, Bobby Emanuel Ezumbia, Ralph O. Ezennia, Defendants–Appellants.**

No. 88–7685.

United States Court of Appeals,
Eleventh Circuit.

June 4, 1990.

Frank D. Cunningham, Mobile, Ala., for Ruby Mae Davis.

Neil Hanley, Mobile, Ala., for Mary Helen Davis.

Joseph M. Powers, Mobile, Ala., for Bobby Emanuel Ezumbia.

John Furman, Mobile, Ala., for Ralph O. Ezennia.

J.B. Sessions, III, U.S. Atty., Gloria A. Bedwell, Donna B. Roberts, Asst. U.S. Attys., for U.S.

Before KRAVITCH, Circuit Judge, ALDISERT * and RONEY**, Senior Circuit Judges.

ALDISERT, Senior Circuit Judge:

■ The major question for decision in these combined appeals from judgments of sentences and convictions entered upon jury verdicts is whether the court was clearly erroneous in calculating the amount of heroin involved in order to compute the applicable sentence guideline under the Sentencing Reform Act of 1984. The determination of the quantity of drugs involved in a conspiracy for the purpose of sentencing is a factual determination subject to the clearly erroneous standard. *U.S. v. Alston*, 895 F.2d 1362, 1367 (11th Cir.1990). We conclude that there was clear error here.

The other issues relate to entrapment, prosecutorial misconduct, evidence reception, the jury charge, severance and whether there was sufficient evidence to support the conviction of Ralph O. Ezennia. We will affirm all the convictions but vacate the sentences, and remand the proceedings for a hearing to make findings from the trial record as to the exact amount of heroin involved. After making such findings, the district court will resentence each appellant in accordance with the guidelines of the Sentencing Reform Act.

I.

Appellants Ruby Mae Davis, Mary Helen Davis, Bobby Emanuel Ezumbia and Ralph O. Ezennia were indicted on two counts. They were charged with conspiracy to possess with intent to distribute less than 100 grams of heroin (a Schedule I controlled

* Ruggero J. Aldisert, Senior U.S. Circuit Judge for the Third Circuit Court of Appeals, sitting by designation.

** *See* Rule 34–2(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit.

substance) and with substantive possession with intent to distribute heroin.

After counsel for appellants filed various pretrial motions, the case went to trial on July 19, 1988, at which time Ezennia's case was severed because his attorney had a trial scheduling conflict. Jury verdicts of guilty were returned against Ruby and Mary Helen Davis. Ezumbia was acquitted on Count Two, the substantive count. The district court declared a mistrial on Count One as to Appellant Ezumbia because the jury was unable to reach a unanimous verdict.

Appellants Ruby and Mary Helen Davis each filed objections to the presentence investigations prepared in their cases, asserting that less than 100 grams of cocaine were involved. Ruby Davis was sentenced to 78 months imprisonment and a supervised release term of five years; Mary Helen Davis was sentenced to 121 months imprisonment and a supervised release term of six years. Both Ruby and Mary Helen Davis were sentenced under the Sentencing Reform Act of 1984. Appellants Ezennia and Ezumbia were rejoined for trial and guilty verdicts were returned against Ezennia on Counts One and Two and against Ezumbia on Count One.

Ezennia, a native and citizen of Nigeria, was sentenced to six years imprisonment on Count One, and eight years imprisonment on Count Two, with these sentences to run concurrently. On Count Two, the district court imposed a special parole term of five years. The district court recommended that the appellant be deported at the appropriate time. Ezumbia, also a Nigerian citizen, was sentenced to six years imprisonment. The district court also recommended that the appellant be deported at the appropriate time. Although Ruby and Mary Helen were sentenced under the Reform Act of 1984, neither Ezennia nor Ezumbia were sentenced under the Act. It bears emphasis that all four appellants were subjects of joint indictments for the same operative facts.

The district courts had proper jurisdiction. We have jurisdiction under 28 U.S.C. § 1291. All appeals were timely filed under Rule 4(b) F.R.App.P.

## II.

The question of the amount of heroin directly affects sentencing under the Sentencing Guidelines Drug Quantity Tables. The table provides a Level 26 for 100–399 heroin grams; Level 24 for 80–99 grams; Level 22 for 60–79 grams and Level 20 for 40–59 grams. Guidelines, U.S. Sentencing Commission, Ch. 2, Part D, § 2D1.1(c), Offenses Involving Drugs; Drug Quantity Table. Mary Helen Davis disputed the allegation in the Presentence Report that 100 grams were implicated and noted that the laboratory report showed only 49.76 grams were involved with a possibility of only an additional 28 grams. In the Criminal Offense Category of I, sentencing at the various levels provides: Level 26: 63 to 78 months; Level 24: 51–63; Level 22: 41–51; Level 20: 33–41. Guidelines, U.S. Sentencing Commission, Ch. 5, Part A, Sentencing Table. Such limits, of course, do not take into consideration possible reductions for minor participants. It does not escape our notice that Count One of the indictment charged a conspiracy "to ... distribute and possess with intent to distribute less than 100 grams, to wit, approximately 4½ ounces of heroin" and Count Two, even less, to wit, "approximately two ounces." It, therefore, becomes apparent that the determination of the correct amount of heroin involved in the trials directly impacts the length of the proper sentence that may be meted out to the appellants.

## A.

■ The sentencing court concluded that at least 100 grams of heroin were implicated. Great discrepancy appeared in the trial record describing the method of weighing the heroin by spoons. On the basis of the information supplied us by brief and at oral argument, we are unable to determine whether the sentencing court made a finding of fact on the record once the amount of heroin was controverted. In any event, we have not been directed to the presence of a transcript recording any fact-finding

process utilized by the sentencing court. Under these circumstances we believe that the interests of justice require that the sentences be vacated and the proceedings remanded for the purpose of conducting an evidentiary hearing that will examine carefully the evidence received at trial regarding the weight of the heroin.

#### B.

■ The sentencing of Ezumbia and Ezennia also puzzles us. Although Ezumbia makes the heroin weight argument as do the Davis appellants, the government notes, and we agree, that Ezumbia was not sentenced under the Sentencing Reform Act. This in itself is sufficient reason to vacate his sentence. Moreover, although Ezennia was charged in the same indictment as the Davis women, he, too, was not sentenced under the Reform Act. We conclude, therefore, that Ezennia's sentence be vacated as well and the proceedings remanded for resentencing under the Act. We now turn to the contentions relating to the substantive offenses. Before doing so, it will be necessary to set forth an extremely lengthy account of the historical or narrative facts adduced at trial.

#### III.

In April, 1988, Eric Tart, a resident of New Orleans, first met Ralph Ezennia at a club in the French Quarter. Tart and some friends were engaged in conversation about heroin. In the process, Tart's friends attempted to negotiate with Ezennia to obtain heroin "on a front." Ezennia said that he had 100 grams or more for distribution.

Tart talked with a friend at another club about the drug, then telephoned his mother to get in touch with Mary Helen Davis to see if she wanted to buy it. Tart's mother, Maxine Julien, lived in Mobile, Alabama, and after her son reached her, she agreed to communicate with Mary Helen. Julien drove to Mary Helen's house to discuss the heroin proposal and Mary Helen agreed to purchase two grams "if the price was right." Tart and Julien discussed the price and the amount of the heroin. Mary Helen

Davis apparently was willing to purchase two ounces at $3,500 per ounce. It was agreed that Julien would look to Mary Helen for the money. In a return telephone call to her son, the price and quantity were agreed upon. Tart agreed to drive to Mobile with Ezennia and make the delivery.

Ezennia picked up Tart at a New Orleans street corner. They first stopped at Ezennia's house in New Orleans and it was at Ezennia's house that Ezumbia entered the picture. Ezumbia put "a package" into the front of his pants, walked to the car and sat in the rear seat. All three then left for Mobile in Ezennia's "beat-up little red car." Tart and Ezennia took turns driving. During the trip, Tart saw Ezumbia open the package that Ezumbia had stuffed in his pants and sprinkle some of the contents on a lighted cigarette.

#### A.

When the threesome arrived in Mobile, Tart attempted to telephone his mother. Because she was not home, they drove to Tart's cousin's house. From there, he reached his mother. They subsequently met and all four drove to her home. Upon arrival, Julien first asked for a sample of the heroin to test it. Mary Helen had told Julien that she, Mary Helen, would have to test it before she paid for it. Ezumbia seemed skeptical, and said they would have to pay for the sample as well. Ezennia represented the sample was "okay" and then gave a small sample to Julien. She left and met Mary Helen at Ruby's house, where they gave the drug to a junkie. He shot the heroin and apparently gave it the junkie's seal of approval.

When Julien returned, she brought "Red Ruby" (Ruby Mae) Davis with her. Julien told the Nigerians that they could get their money the next morning and they agreed to spend the night at her house.

The next morning, after Ruby Davis requested another sample, she came to the house to get it. Julien and Ruby Davis left again. In Julien's absence, Mary Helen Davis telephoned Julien at Julien's house and Tart answered the phone. Mary Helen

wanted to know what was taking so long, whether everything was going all right, and whether the heroin was of good quality. Meanwhile, Julien had met Mary Helen to obtain the purchase price for the heroin. Mary Helen furnished $2,200, Julien lent her $500 and they obtained an additional $100 from a woman at Mary Helen's house, making up the total purchase price of $3,500 for one ounce. Julien and Ruby then returned to Julien's house.

When Julien and Ruby Davis returned to the house, they brought a triple beam scale to weigh and divide the heroin. Julien told Ezennia and Ezumbia that she only had money for one ounce. Into this scenario now appears either a confidence game or a contrived heroin-weighing process designed to confuse the Nigerians. This "weighing game" may have contributed to the later problem of determining how much heroin was actually involved in the transaction, a problem, as we have indicated, that was to loom so importantly in calculating the sentence under the Reform Act's guidelines.

Because there appeared to have been a defect in the scale, Ruby Davis used measuring spoons to divide the heroin. Here, Ruby conducted an informal class on how to weigh heroin. She convinced Ezennia and Ezumbia that four tablespoons of heroin equalled an ounce. But, on her own part, Julien called the library and the drugstore and verified that two tablespoons—not four—constituted an ounce.

Ezennia and Ezumbia agreed to weigh and divide all the heroin, even though Julien was to receive only one ounce. Ruby Davis "measured" and "weighed" all of it, putting four spoons of heroin in each bag to reflect one ounce per bag. Ezennia and Ezumbia had agreed to sell the heroin for $3,300 per ounce, and Mary Helen Davis agreed to purchase it for $3,500 per ounce, with Tart receiving the $200 difference. Julien gave the $3,500 to Tart, explaining that the funds came from Mary Helen Davis. Tart kept his $200 and gave the balance to Ezennia and Ezumbia who then counted the money and sorted it into stacks. Ezumbia gave Tart an additional $100, and they returned to New Orleans, where, at Ezennia's house, they celebrated with champagne the success of the transaction.

Meanwhile back in Mobile, after Ezennia and Ezumbia left, Ms. Julien and Ruby Davis divided the first so-called "ounce" of heroin. They kept the extra ounce, and Ms. Julien delivered it to Mary Helen's sister in accordance with Mary Helen's instructions. Ms. Julien took the fronted "ounce" and the extra ounce to a friend, who went by the fascinating name of Gwen Crook, who agreed to hold it for Julien.

After Tart and the Nigerians returned to New Orleans they had conversations about getting additional heroin to sell. Ezumbia or Ezennia said it would be a while before they got some more because they brought it in from Europe. Texas was also mentioned as a possible source.

## B.

Julien's 18–year–old daughter, Nicole Tart, and her boyfriend, Jacques Washington, stayed at Julien's house during the night Ezennia, Ezumbia and Eric Tart were there. Julien had explained to them that the Nigerians were foreigners, that "the foreigners" had brought her a package of heroin and that she had to obtain the money from Mary Helen Davis to buy it. Julien asked Jacques to spend the night there because she did not know the strangers and that she was suspicious.

Within a few days of this incident, Jacques came to Julien's house where he met Nicole who told him that Mary Helen and Ruby Davis were inside. Jacques entered the kitchen to obtain some dishwashing liquid preparatory to washing his car, and he saw Julien, Ruby Davis, Mary Helen Davis, and Nicole there. He saw a "good handful" of powdery substance on the kitchen table that looked like brown sugar. Nicole recognized it as heroin.

Mary Helen and Ruby Davis were cutting or stepping on the heroin. Mary Helen was using a playing card, a small spoon, and a funnel to package the powder into small balloons. Ruby Davis and Julien were tying balloons. Ruby Davis wanted

to shut the curtains, but Julien said it was not necessary. Mary Helen Davis told Jacques to let them know if anyone was coming into the house. When Jacques and Nicole left, Mary Helen and Ruby Davis were still there. When Nicole returned, only her mother remained. Nicole was not charged with any offense.

Ruby Davis and Julien then attempted to sell the heroin which they had obtained from the Nigerians. Julien contacted R.C. Grayson to see if he would buy or sell it. She and Ruby Davis agreed to give him a sample for $650. The Grayson transaction was surveilled and monitored by law enforcement agents who followed Julien from the transactions scene to Carver State School, where she met with Ruby Davis and split the money. She and Ruby agreed to pay Gwen Crook $100 for storing the heroin. Law enforcement officers followed Crook to Chateau Oaks Apartments. Julien was seen to go inside. Her arrest followed.

After her arrest, Julien agreed to cooperate with the authorities. She gave them the remaining portion of the extra ounce she intended to sell to R.C. Grayson. Taken to police headquarters, she agreed to continue her cooperation and was released with instructions to return the next morning.

Julien did return as promised and told the officers about the other heroin at Crook's house. She agreed to recover it and turn it over to police. She also agreed to record conversations with Ruby Davis and Ralph Ezennia about the other heroin. Julien called Ezennia that morning and arranged for him to come to her house to get the money for the fronted "ounce." She also taped two conversations with Ruby Davis about the remaining heroin. She taped also the conversations with Ezennia and Ezumbia when they came to her home to get their money. They were arrested after she gave them $4,500 for the additional heroin.

The taped statements were played for the jury, as well as the videotape of Julien's sale to R.C. Grayson. The government's criminalist, who analyzed the heroin that was recovered in the investigation, testified that a total of approximately 49 grams of heroin had been maintained as evidence in this case.

## C.

Ezumbia took the stand in his own behalf and testified that he was visiting the United States on business to locate chemical companies in connection with his family paint business in Nigeria. He stayed with Ezennia, a long-time friend. He denied any knowledge of the heroin transaction and insisted that Ezennia told him to say "Bombay" and "99%" on cue while they were in Mobile visiting a lady on business whom Ezennia knew. Julien testified that Ezumbia told her that he could get a certain amount of heroin for her every five or six weeks, and that the heroin came from Bombay through New York. When Ezennia and Ezumbia returned to Mobile, however, to conclude the second transaction, the room in which the discussion took place had been fitted with electronic listening devices by the police authorities. The police heard Julien tell Ezennia that it was "some good heroin we bought."

Ezennia responded, "That's what I told you." She asked if he could get five ounces, and Ezennia replied that he could get more than that, up to 300 grams, or nine ounces. Julien asked if it was "Mexican stuff," and Ezennia said it came from Colombia. Ezumbia corrected him and said, "Bombay". Ezennia said it was the best they had. Ezennia said four other people wanted it because they did not "step it" and it was 99% pure. Ezennia asked about Mary, and Julien gave them the money.

## D.

The officers, who were listening to the conversation by a transmitter, then rushed into the room and arrested Ezennia and Ezumbia. Ezennia was advised of his rights and he said he understood them. Ezennia then told Sgt. Sam Cochran that he understood the seriousness of the charge because "heroin is heroin is heroin all over the world." He said he did not

know why he did it because he had just gotten his real estate license and was doing well.

Ezumbia was also advised of his rights and he said he understood them. Ezumbia told Officer Billy Noel that he had arrived in the United States through New York and that he travelled to New Orleans when he was staying with Ezennia. He said the purpose of his travel was to look for outlets to buy chemicals to make paint. He said he came to Mobile with his friend just to go along for the ride. He said he did not know anything about the nature of his friend's business in Mobile. Ezumbia claimed his chemical company visits were very successful, but he could not identify any company that ships chemicals to his business or signed a contract.

## IV.

With the foregoing scenario as a backdrop, we now address the several issues raised by the appellants relating to their convictions. Because the contentions are fact-specific, a detailed discussion of the law and a repetition of relevant facts are not necessary.

## A.

■ We are satisfied that Ruby Davis failed to meet her initial burden sufficient to raise the issue of entrapment. Entrapment is an affirmative defense which requires the defendant to present some evidence of government misconduct or improper inducement before the issue is properly raised. *United States v. Smith*, 840 F.2d 886, 887 (11th Cir.1988). The defendant has the initial burden of producing evidence to establish government misconduct, and the law clearly requires more than a scintilla of evidence that improper government conduct created the risk that a person other than one ready to commit the offense was so involved. *Id.* Only after the defendant meets this burden is a jury question on entrapment presented. *Id.* The sufficiency of the defendant's evidence is a question of law, which requires the district court to review the evidence in the light most favorable to the defendant. *Id.*,

at 887–88. The trial court's ruling on this legal question is subject to *de novo* review when on appeal. *United States v. McKennon*, 814 F.2d 1539, 1543 (11th Cir.1987).

■ The only evidence that Ruby Davis claimed as her initial showing of improper government conduct was that Julien was cooperating with law enforcement when Julien first recorded conversations with Davis. An examination of the taped conversation itself fails to establish any argument that appellant Ruby Davis was anything but ready to commit the offense. It establishes that Ruby Davis and Julien were in the midst of a heroin distribution conspiracy as partners, and that Ruby Davis was actively attempting to locate a buyer for some or all of the heroin.

More important, the subsequent taped conversation further establishes Ruby Davis' participation in the illegal acts predates Julien's arrest and agreement to cooperate with the government. Ruby Davis stated that she had customers attempting to obtain heroin from her, that she has continued her efforts to locate a distribution outlet, that she is familiar with Julien's effort to sell the heroin to Grayson and suggests a more appropriate price she should charge Grayson, and that Ruby Davis is familiar with the practices and participation of co-conspirator Mary Helen Davis.

Even in the light most favorable to the appellant, there was no evidence of improper government conduct sufficient to establish a prima facie case of entrapment. The trial court correctly found as a matter of law that there was no showing to justify a claim of entrapment. Accordingly, the district court properly refused to instruct the jury on entrapment. "A defendant is entitled to have the court instruct the jury on his defense theory only if that theory has an evidentiary foundation and the requested instruction presents a cognizable legal defense." *United States v. Fernandez*, 837 F.2d 1031, 1035 (11th Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 102, 102 L.Ed.2d 78 (1988).

### B.

 We are satisfied that the evidence was sufficient to support Ezennia's conviction. On review we are to decide if the evidence, viewed in a light most favorable to the government, proved Ezennia's guilt beyond a reasonable doubt. *United States v. Carcaise,* 763 F.2d 1328, 1330–31 (11th Cir.1985). Evaluating the relevant facts set forth heretofore in Part III, we have concluded that the government proved the elements of conspiracy. *United States v. Corley,* 824 F.2d 931 (11th Cir.1987); *United States v. Jenkins,* 779 F.2d 606 (11th Cir.1986); *United States v. Sullivan,* 763 F.2d 1215 (11th Cir.1985).

### C.

 We are not persuaded by Ezumbia's claim of prosecutorial misconduct in the government's offer of a videotape as a prior consistent statement of the witness. The videotape was offered for a limited purpose and Ezumbia failed to object at trial to its use on these restricted grounds. Accordingly, we apply the standard of plain error and we find none.

### D.

Similarly, we conclude that there was no abuse of discretion in the trial court's admitting various portions of testimony and items of evidence against Ezumbia. Moreover, the court's oral charge to the jury fairly covered Ezumbia's requested charges. The trial court did not err in refusing to charge in the specific language requested. Finally, we conclude that the court did not abuse its discretion in denying Ezumbia's motion for severance. He was unable to show irreconcilability and mutually exclusive defenses and he did not show any prejudice, except to say that he was convicted.

### V.

We have carefully considered all the contentions presented by the four appellants. We affirm their convictions in all respects.

For the reasons set forth in Part II, however, we are persuaded that the inter-ests of justice will be served if the district court conducts a presentencing hearing for the purpose of determining the exact quantity of heroin set forth in the record sustaining the convictions. It will be upon these findings that the court will resentence in accordance with the guidelines. Moreover, the sentencing record should affirmatively indicate that any resentencing of Ezumbia and Ezennia is in accordance with the Sentencing Reform Act. Accordingly, the sentences heretofore imposed are VACATED and the proceedings REMANDED for resentencing in accordance with the foregoing.