[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 18-12725
_____

DC Docket No. 1:13-cr-00379-TCB-AJB-3

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JONG SUNG KIM,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(August 13, 2020)

Before WILLIAM PRYOR, Chief Judge, JILL PRYOR and LUCK, Circuit Judges.

PER CURIAM:

Jong Sung "John" Kim appeals his convictions for aiding and abetting two

violations of the Hobbs Act, 18 U.S.C. § 1951(a).  He advances three arguments on

appeal: (1) the evidence was insufficient to support his convictions for Hobbs Act extortion and the counts of conviction were multiplicitous; (2) the district court erred in refusing to instruct the jury on the defense of entrapment; and (3) the district court abused its discretion by denying his motion for a new trial after the jury was exposed to extrinsic and prejudicial information about him.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

By a second superseding indictment, returned in November 2015, the government charged Kim with four violations of the Hobbs Act in connection with a scheme to extort money from others through force, violence, and fear. The indictment alleged that Kim conspired to commit Hobbs Act extortion (count one) and aided and abetted in three substantive acts of Hobbs Act extortion on December 16, 2009 (count three), January 13, 2010 (count five), and January 21, 2010 (count six), all in violation of 18 U.S.C. § 1951(a). The fourteen-count indictment also charged drug and gun offenses that did not implicate Kim.

The charges against Kim arose out of activities relating to the Gah Bin Korean bar and restaurant in Duluth, Georgia. According to the indictment, in July 2009, Yoo Jin "Eugene" Chung, aided and abetted by Kim and others, demanded a monthly share of the profits of Gah Bin from its proprietor in exchange for "protection." Chung made it known to the proprietor that he and his co-conspirators routinely carried firearms and terrorized other Korean business owners in the area.

2

In exchange for the monthly protection payments, Chung agreed to refrain from, and to deter others from, physically assaulting the proprietor, harassing his customers and employees, and damaging the business.

The indictment further alleged that the proprietor began making monthly protection payments to co-conspirators in July 2009. But he missed a payment later that year. So on December 16, 2009, Chung, Kim, and three others went to Gah Bin, forced the proprietor into a karaoke room, and demanded payment. Pointing a gun at the proprietor's head, Chung threatened to kill him. A co-conspirator punched the proprietor in the face and broke his nose, and Chung struck him in the head with the pistol, knocking him unconscious. When the proprietor awoke, Kim directed him to pay Chung. Thereafter, the proprietor made protection payments of $500 each to Kim on January 13, 2010, and January 21, 2010.

Kim pled not guilty to the indictment and proceeded to trial, while his co-defendants pled guilty. The jury found Kim not guilty of counts one and three, the conspiracy count and the extortion count based on the December 2009 assault, but guilty of counts five and six, relating to the January 2010 payments. In summarizing the events at trial, therefore, we focus on counts five and six.

At trial, Gah Bin's proprietor, Yoon Soo Lee, gave testimony largely consistent with the indictment. He testified about the protection-payment arrangement, the December 2009 assault at Gah Bin, and working with the FBI in

3

the weeks that followed to set up the two $500 payments to Kim in January 2010. The FBI recorded these two meetings and other telephone calls between Kim and Lee.  Transcriptions and translations of these recordings were admitted into evidence, and the government played some of these recordings for the jury.

According to the transcripts, Kim and Lee spoke by phone on January 6, 2010. Lee discussed the December 2009 assault and another more recent incident at Gah Bin involving someone named Chul An.  Lee was beaten up by Chul An and his group after Lee demanded they pay their bar tab.  Lee told Kim he was "asking for help" because he could not operate his business if similar incidents continued to happen.  Lee then stated, "So if you want [it], [I'll] give [it] to you.  If [Chung] wants [it], [I'll] give [it] to [Chung]."  Lee clarified, "The five hundred dollars that [I] used to give to [Chung]."  Kim responded, telling Lee, "I, this money management, I don't care.  I don't know.  [It's] not mine."

Kim then turned the conversation briefly to other matters, explaining that he did not have any problems with Lee and was considering calling Chul An.  Lee returned to the issue of paying Kim:

> Lee:    [H]ow [I] give or what [I] give to [Chung], should [I] give that to you.  Especially since you are the big brother.
>
> Kim:    Okay.
>
> Lee:    If the business is good, that five hundred, I would rather be left in peace than cause problems because of it.

Kim:     Yea.

Lee:     So the five hundred dollars, since you are also having difficulty, if you want [me] to give you the five hundred, [I] can give it to you, or if [Chung] wants it, [I] can give it to [Chung], but either way please don't cause problems for me.

Kim:     Okay. I will help so as to not cause problems [for you] about this.

Lee:     Okay, then I will give you five hundred dollars starting next week. . . . If the business gets better, then of course [I will] give more. But the business is not good, so I will give the five hundred to you, or to [Chung], or you guys split it or whatever, but please don't cause problems for me.

Kim:     Okay. Understood.

Kim and Lee also discussed what had led to the December 2009 assault. Apparently, Lee had given $700 to another person to give to Chung, but that person failed to convey the money to Chung. When Lee stated he wanted to be left in peace, Kim encouraged him to fight back and stand up for himself.

Following their telephone conversations, Kim and Lee met at Gah Bin on January 13. Near the beginning of this conversation, Lee said he usually made the $500 payments directly to Chung, but he would give the money to Kim this time. Kim said he understood and would "take care of it." Then, near the end of the conversation, Lee stated, "I will give you $500. Please, brother, do this for me. You can give to [Chung] tomorrow or something. OK?" Kim replied, "Ok. I received," and apparently took the money. Lee mentioned Chul An's group and told Kim to

5

"[m]ake sure nothing happens." Kim responded, "Understood. Don't worry. I promise."

The next day, January 14, Kim and Lee spoke by phone. Kim informed Lee he had told Chul An to leave Lee alone because "[Chung] is protecting." Lee asked if Kim was planning on "giving the $500 I gave to you yesterday to [Chung] or will you keep it?" Kim said "[n]o" and asked "[w]hy should I keep it?" Lee indicated his concern that Chung "might put [a] gun on me again." Kim said he was about to meet with Chung and would call Lee when he did so.

Later that day, Lee spoke with both Kim and Chung by phone. Chung thanked Lee for the money and indicated that Kim had kept half of the $500. Lee said he would give Chung the money directly next time, stating, "[s]o from now on do not put [a] gun on [me]." Chung said he understood and would "protect you brother," also promising to "take care of" Lee's problems with Chul An.

On January 21, Kim and Lee again met at Gah Bin. Lee paid Kim another $500. The meeting also included further discussion of the December assault, Lee's fear of being harmed by Chung, and other problems with business. Kim advised Lee "[t]o get a restraining order."

Other witnesses confirmed the details of the December 2009 assault at Gah Bin, including an FBI special agent who testified that, after his arrest, Kim admitted to the same basic fact pattern described above, except for the protection-

6

payment arrangement.  The jury also heard testimony that Chung and Kim were "[c]lose like brothers"; that Chung and Kim beat up people to collect debts; that Chung, Kim, and others were a known "gang" in the Korean community who had previously caused trouble for Lee—refusing to pay tabs and causing property damage—at other businesses he operated; and that it was Kim who suggested going to Gah Bin on the night of December 16 to collect from Lee.

The defense admitted that Kim accepted two $500 payments from Lee in January 2010 but argued that Kim believed the payments were for legitimate business debts and that the government "creat[ed] crime" by setting up the payments. As to the first argument, there was some testimony that Lee had agreed to pay Chung either $500 or a percentage of profits every month in exchange for being allowed to run Gah Bin.  This evidence reflected that Chung had invested $25,000 in Gah Bin, but the prior owner fled with the money and the business shut down.  Chung needed someone to operate Gah Bin, so he entered into an arrangement with Lee to try to recoup these losses.  So, the argument went, when Kim accepted the payments from Lee, he believed he was simply collecting a legitimate business debt.  And the December 2009 assault was nothing more than a drunken "bar fight."

As to the second argument, Kim requested at the charge conference this Circuit's pattern jury instruction on entrapment with respect to counts five and six. The government objected on two grounds:  (1) Kim had to "affirmatively admit

7

guilt" to be entitled to the entrapment instruction; and (2) the evidence did not support the charge. The district court refused the instruction, stating, "This is not an entrapment case, I am not going to give that charge."

The jury acquitted Kim on the conspiracy count and one substantive count of Hobbs Act extortion but returned a guilty verdict on counts five and six, the two other substantive Hobbs Act extortion charges. Two weeks after the verdict, Kim filed a motion for a new trial. In support of the motion, Kim's counsel explained that he discovered the day after the trial ended that extraneous and prejudicial information about Kim had been included in government exhibit 15 inadvertently. This exhibit was a transcript of the January 21, 2010 recorded meeting between Kim and Lee. The full exhibit was fifty-one pages long and divided into three parts, each with its own cover sheet with identifying information.

Kim's counsel explained that the government had led him to believe that only the first part, to which he had no objection, would be introduced at trial. For that reason, he did not object to the admission of government exhibit 15, which was offered as a single exhibit with the cover page for part one on top. But government exhibit 15 actually included all three parts, so the jury was exposed to, in Kim's view, irrelevant and prejudicial information about him: in the second part, Kim discussed a shooting with a "black kid" and being involved in a fight, and in the third

8

part, Kim admitted to selling and using cocaine, avoiding a sting by the FBI, and serving time in jail.

The district court denied the motion, concluding that a new trial was not warranted. The court found that any prejudice stemming from the second and third parts of government exhibit 15 was "outweighed by the extensive evidence of his guilt and the fact that his counsel failed to object to the evidence at trial." This appeal followed.

Kim presents three arguments on appeal. First, he argues that his convictions are not supported by sufficient evidence in the record and that the counts of conviction were multiplicitous. Second, he maintains that he was entitled to an entrapment instruction. And third, he contends that he was entitled to a new trial because of the inadvertent and prejudicial admission of the second and third parts of the January 21, 2010 transcript.

## DISCUSSION

*Sufficiency of the Evidence and Multiplicity*

We begin with the issue of sufficiency. We review de novo the sufficiency of the evidence to support a conviction. United States v. Harris, 916 F.3d 948, 953 (11th Cir. 2019). We view the evidence in the light most favorable to the government, drawing all reasonable inferences and credibility determinations in the government's favor. Id. at 953–54. We will affirm the conviction if a reasonable

9

jury could conclude that the evidence establishes the defendant's guilt beyond a reasonable doubt. Id.

The Hobbs Act prohibits interference with interstate commerce by robbery or extortion. See 18 U.S.C. § 1951(a). "Hobbs Act extortion contains two elements: (1) extortion, and (2) interference with interstate commerce." Harris, 916 F.3d at 954 (quotation marks omitted). The statute defines extortion as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2). An offense occurs when a defendant exploits a victim's reasonable fear of either physical harm or economic loss. Harris, 916 F.3d at 958; United States v. Flynt, 15 F.3d 1002, 1007 (11th Cir. 1994). The government need not prove that "the defendant caused the fear or made a direct threat," only that he "intended to exploit the fear." Flynt, 15 F.3d at 1007.

Under 18 U.S.C. section 2, a defendant may be found guilty of aiding and abetting an offense. Section 2 reflects the view that "a person may be responsible for a crime he has not personally carried out if he helps another to complete its commission." Rosemond v. United States, 572 U.S. 65, 70 (2014). "[A] person is liable under [section] 2 for aiding and abetting a crime if (and only if) he (1) takes an affirmative act in furtherance of that offense, (2) with the intent of facilitating the offense's commission." Id. at 71.

10

Here, the district court did not err in finding sufficient evidence to support Kim's convictions. The government presented evidence from which a jury could conclude beyond a reasonable doubt that Kim twice aided and abetted Hobbs Act extortion. See 18 U.S.C. § 1951(a), (b)(2). Lee testified that he made monthly payments to Chung in exchange for protection and that Chung and others assaulted him in December 2009 because Chung believed he missed a payment. Kim witnessed the assault and then directed Lee to pay Chung. Then, when Lee discussed making the payments to Kim instead, Lee made clear that he feared further violence and economic loss. In connection with the first payment, Lee referenced the prior assault and the resulting loss of business and implored Kim to "please [not] cause problems for me." Lee was even more explicit in connection with the second payment, telling Kim that he was making the payment so that Chung would not "put [a] gun on [him] again." Knowing that Lee feared Chung and was making the payments to forestall further incidents like the December 2009 assault, Kim took the money on Chung's behalf. A reasonable jury could conclude from this and other evidence that Kim aided and abetted Hobbs Act extortion by obtaining money from Lee that was "induced by wrongful use of actual or threatened force, violence, or fear."[1] See 18 U.S.C. § 1951(b)(2); Harris, 916 F.3d at 958; Flynt, 15 F.3d at 1007.

---

[1] Kim's acquittal on counts one and three does not alter this analysis. The jury reasonably could have concluded that the December 2009 assault was just a "bar fight," not extortion, but that this incident created a reasonable fear in Lee of further violence or economic loss that was then

Kim attacks Lee's credibility, but Lee's testimony was not so incredible that no reasonable jury could believe him. "Credibility determinations are the exclusive province of the jury," and we may not disturb a credibility determination unless the witness's testimony is "incredible as a matter of law." United States v. Hano, 922 F.3d 1272, 1289 (11th Cir. 2019) (quotation marks omitted). "Testimony is incredible as a matter of law if and only if it is unbelievable on its face, i.e., testimony as to facts the witness physically could not have possibly observed or events that could not have occurred under the laws of nature." Id. (quotation marks omitted).

Nothing of the kind could be fairly said of Lee's testimony. Lee testified as to matters within his personal knowledge and supported by other witnesses and evidence, including the recorded phone calls and meetings with Kim. Despite some inconsistencies in the evidence and Lee's prior acts of dishonesty, the jury was aware of this information and was entitled to credit Lee's testimony.

Finally, Kim contends that counts five and six were multiplicitous, so one of the two counts should be dismissed and the case should be remanded for resentencing. We disagree.

"The concept of multiplicity arises from charging a single offense in more than one count." United States v. Eaves, 877 F.2d 943, 947 (11th Cir. 1989). With

exploited by Chung and Kim on two occasions in January 2010, even if the jury found insufficient evidence that Kim joined a broader conspiracy.

12

respect to Hobbs Act extortion, "[e]ach relinquishment of property" manifesting the elements of Hobbs Act extortion "is a separate offense that may be the subject of a separate count." Id. (quotation marks omitted). Kim cannot succeed on his multiplicity argument.

In support of his multiplicity argument, Kim points to Eaves. In Eaves, we held that two counts were multiplicitous because they stemmed from a single agreement the defendant made to accept $30,000 that the FBI agent, at the government's request, paid in two installments. 877 F.2d at 947. The payments, in other words, were "installments of a lump sum." Id. (quotation marks omitted). We explained that "[c]harging more than one violation under the facts that form the basis of [the two counts] would give the government unfettered discretion to determine how many crimes with which to charge a defendant by manipulating the methods of payment." Id.

This case is not like Eaves. According to the indictment and supporting evidence offered at trial, the payments in this case were not, in contrast to Eaves, "installments of a lump sum." Rather, they were recurring payments for protection. Nor is there any concern here, as there was in Eaves, of government manipulation of the methods of payment "to determine how many crimes with which to charge a defendant." Id. The government did not alter the previous arrangement's methods of payment. In short, the special circumstances present in Eaves are not present here.

13

Instead, this case is like United States v. Tolub, 309 F.2d 286, 289 (2d Cir. 1962), cited in and distinguished by Eaves. Like Tolub, this case involved successive extortion payments "during the continuance of the same underlying conditions." Id. (where the defendant received weekly payments following an initial verbal threat, holding that "each acceptance of payment by [the defendant] during the continuance of the same underlying conditions was a separate act of extortion"). Each of the two payments at issue here manifested the elements of Hobbs Act extortion, despite the lack of any clear intervening threats between the two payments. See Eaves, 877 F.2d at 947. The evidence shows that both payments were induced by use of fear. We reject Kim's multiplicity challenge.

*Entrapment Instruction*

Next, we consider Kim's argument that the district court erred in refusing to give an entrapment instruction on counts five and six. We review de novo a district court's refusal to give an entrapment instruction. United States v. Dixon, 901 F.3d 1322, 1346 (11th Cir. 2018).

The entrapment defense has two elements: "(1) government inducement of the crime, and (2) lack of predisposition on the part of the defendant." Id. (alteration omitted). "Before an entrapment defense may be presented to the jury, an evidentiary foundation for a valid entrapment defense must be present." United States v. Alston, 895 F.2d 1362, 1367 (11th Cir. 1990). "The defendant bears an

14

initial burden of production to show government inducement." Dixon, 901 F.3d at 1346 (alteration and ellipsis omitted). "He can satisfy this burden by producing any evidence sufficient to raise a jury issue that the government's conduct created a substantial risk that the offense would be committed by a person other than one ready to commit it." Id. (quotation marks and alterations omitted). "Only after the defendant has sustained his initial burden does the issue of entrapment become a question of fact for the jury." United States v. Parr, 716 F.2d 796, 802 (11th Cir. 1983).

The district court does not err in refusing to give the entrapment instruction where the defendant was in the process of committing the federal offense, or did commit it, before the government got involved. The government's conduct does not create a substantial risk that the offense would be committed where the defendant already committed the offense. Or, put another way, there can be no government inducement where the defendant is already committing the crime before the government involved itself in the case.

In Parr, for example, Rendaro conspired with two co-defendants to sell counterfeit money to an undercover agent with the United States Secret Service. Id. at 800–02. Rendaro was convicted, after a jury trial, of conspiracy and substantive counterfeiting violations. Id. at 802. He argued on appeal that the "trial court erred in refusing to instruct the jury as to an entrapment defense." Id. We affirmed in part

15

because the Secret Service agent's contact "occurred in tracing back to Rendaro a circulated counterfeit bill and further by the fact that <u>prior to this initial contact</u> Rendaro had taken steps to encourage [a co-conspirator] to handle the printing of the counterfeit money." <u>Id.</u> at 803 (emphasis added). Before the agent was introduced to Rendaro, the Secret Service received a counterfeit bill that Rendaro had given to a third person and he was already involved in printing money. <u>Id.</u> at 800–01, 803.

Also, in <u>United States v. Crosby</u>, 739 F.2d 1542 (11th Cir. 1984), co-defendant Hirsch bought phenyl acetone (P2P) from an informant working for the Drug Enforcement Administration. <u>Id.</u> at 1543. Hirsch and a co-defendant were convicted of conspiring to possess phenyl acetone with the intent to manufacture methamphetamine. <u>Id.</u> Hirsch argued on appeal that the district court erred in refusing his request for an instruction on the issue of entrapment. <u>Id.</u> at 1544. We affirmed because "[t]he evidence in this case conclusively established that it was not until <u>after</u> Hirsch approached the chemical company and attempted to purchase P2P that the government became involved." <u>Id.</u> (emphasis added). Hirsch "came to the attention of the Drug Enforcement Administration, following a phone call from an employee of a chemical company, who indicated that Hirsch had contacted her in an effort to purchase P2P." <u>Id.</u> at 1543. The DEA got involved only after Hirsch made the initial contact to buy the chemicals for the meth conspiracy.

And, in United States v. Davis, 902 F.2d 860 (11th Cir. 1990), the defendant was convicted of distributing heroin after one of her former co-conspirators was arrested and started taping her conversations with the defendant. Id. at 865. We were "satisfied that [the defendant] failed to meet her initial burden sufficient to raise the issue of entrapment" because the defendant and her former co-conspirator "were in the midst of a heroin distribution conspiracy as partners" and the defendant "was actively attempting to locate a buyer for some or all of the heroin." Id. at 866. The evidence, we said, established that the defendant's "participation in the illegal acts predates [the former co-conspirator's] arrest and agreement to cooperate with the government." Id. (emphasis added).

Finally, in Dixon, the defendant argued that "he was entitled to have the jury instructed on entrapment in relation to his conviction for possession of a firearm by a felon." 901 F.3d at 1347. We affirmed because "no evidence adduced at trial suggest[ed] that the government induced [the defendant] to possess the gun that he later sold." Id. (quotation marks omitted). Indeed, we said, the evidence (the defendant nicknamed his gun) suggested "that he possessed it before the government entered the picture." Id. (emphasis added).

Here, as in Parr, Crosby, Davis, and Dixon, the evidence was that Chung and his co-conspirators, including Kim, extorted money from Lee, the proprietor of the Gah Bin bar, starting in July 2009—months before the government entered the

17

picture.  When the proprietor missed a payment, on December 16, 2009—also before

the government entered the picture—Chung, Kim, Andy, and two other co-

conspirators went to the Gah Bin bar.  Here is what Lee said happened:

> I think that night around—past around 10:00 o'clock.  That time John Kim, [Chung], Brian Kong, Jin Ho, Andy . . . as soon as they came into the store they saw me. . . .
>
> [Chung] grabbed me and dragged me to this room, big room.  As soon as we got into that room, Eugene cursed me out in Korean and English and asked me to give me money.  So first I said, what money? You didn't pay.  So I said, I gave money to [another co-conspirator]. [Chung] was cursing me out and screaming and push me down and choke on my throat, grabbed my throat and asking for money, so I continued said I gave money.  And [Chung] told Andy, go get the gun, and then Andy brought gun in.  As soon as [Chung] got a gun from Andy, he put the gun jack, jack in the gun and then point at my forehead and.  And he was pointing at my forehead and continues, said if you don't give me money, I will kill you.
>
> I continue say I pay, I pay.  [Chung] hit me with the gun first, and then Andy hit me.  And then I fell, and I think I passed out, pass out.  And after I pass out, when I woke up, I was covered with blood. And in my body there was footprints on my body and there was—my face was wounded. When I woke up, [Kim] and Andy was the only ones there.  As soon as Andy saw me, that I was wake up—I woke up, he left.  After that, I talked to [Kim].  [Kim] said, do not call police.  If you continue pay to [Chung], everything will be fine.  I said, okay.  And that's it.

Kim told Lee the bar owner that if he paid Chung, "I will protect you from [him].  I

will make sure of it."  After the beating, Lee called the FBI and, with its help, he

recorded making the payments to Kim and Chung on January 13 and January 21,

18

2010. Those payments, and the conversations setting up those payments, were played for the jury.

Because Kim was extorting Lee before the FBI got involved, Kim failed to show that the government created a substantial risk he would commit an extortion he was not ready to commit. He was ready and did extort Lee months before the FBI entered the picture. Based on the evidence, the district court correctly concluded that "[t]his is not an entrapment case."

*Government Exhibit 15*

In his final argument, Kim contends that the district court erred in denying his motion for a new trial because the jury was given the unadmitted portions of government exhibit 15—the transcript of the January 21, 2010 extortion payment. According to Kim, the transcript had three parts, and only the first part was admitted into evidence. But, he says, the unadmitted second and third parts of the January 21, 2010 transcript went back to jury. Because the jury was exposed to the extraneous unadmitted parts, and those parts had prejudicial information about prior bad acts, Kim argues, the district court should have granted the new trial motion.

"When jurors consider extrinsic evidence, a new trial is required if the evidence poses a reasonable possibility of prejudice to the defendant." United States v. Perkins, 748 F.2d 1519, 1533 (11th Cir. 1984). Once a defendant makes a "colorable showing that the exposure has, in fact, occurred," it is the government's

burden "to show that the jurors' consideration of extrinsic evidence was harmless to the defendant."  United States v. Siegelman, 640 F.3d 1159, 1182 (11th Cir. 2011) (quotation marks omitted).  We review a court's conclusion that extrinsic evidence was harmless for abuse of discretion.  United States v. Dortch, 696 F.3d 1104, 1110 (11th Cir. 2012).

We assume (without deciding) that unadmitted portions of the January 21, 2010 transcript went back to the jury during deliberations.  Still, we agree with the district court that the government met its burden to show that any exposure was harmless and did not prejudice Kim's case.

First, the evidence was overwhelming.  See United States v. Bolinger, 837 F.2d 436, 440 (11th Cir. 1988) ("The district court denied de la Fuente's two motions for new trial on the ground that the evidence against de la Fuente was so overwhelming that the introduction of extrinsic evidence could not have been prejudicial.  We agree.").  The district court summarized the evidence against Kim as follows:

> [T]he Court concludes that any prejudice to Kim was harmless error in light of the other evidence supporting his conviction.  See, e.g., United States v. Brown, 805 F.3d 13, 17 (1st Cir. 2015) (determining that any error was harmless in light of other evidence of guilt and ambiguous content of potentially prejudicial evidence).  Several witnesses testified for the Government at trial, including Patrick Lee (who testified regarding prior violence Kim and Defendant Eugene Thomas Chung directed at Yoon Soo Lee); Brian Kong (who testified that Kim encouraged Chung to go collect money from Yoon Soo Lee on the day of the violent assault and extortion of Lee); FBI Special Agent Bill Gant

20

(who testified that on the day Kim was arrested, Kim admitted he was aware that Yoon Soo Lee had stopped paying Chung, that he was present when others assaulted Lee in December 2009 for his missed payment, and that on the day of the relevant incident Chung pointed his gun at Lee and another Defendant punched Lee in the face); Yoon Soo Lee (who, as the victim, testified to years of trouble with Chung, Kim, and others, described what happened on December 16, 2009, and confirmed that the payments were made to Kim after Kim told Lee after the assault that he would protect Lee if Lee made the payments); and FBI Special Agent C.S. Kim (who testified that in Defendant Kim's interview on the day he was arrested, Kim demonstrated consciousness of guilt).

The jurors heard from Kim's victim and two of his co-conspirators about the extortion scheme. They heard Kim's confession. And, most important, they heard the audio recordings showing that the bar owner paid Kim for Chung's protection.

Second, any exposure to the second and third parts of the January 21, 2010 transcript was harmless because of the jury's split verdict. Kim argues that the unadmitted parts of the January 21, 2010 transcript "contain[ed] extrinsic evidence of other crimes" that Kim would have moved to exclude under Federal Rule of Evidence 404(b). But the jury's acquittal on counts one and three shows that it was not prejudiced, and its verdict was unaffected, by the unadmitted portions of the transcript. See United States v. McNair, 605 F.3d 1152, 1205 (11th Cir. 2010) ("And the jury acquitted some defendants on some counts while convicting them on others. This further demonstrates the jury was not confused and could segregate the 404(b) evidence from other evidence."); United States v. Prosperi, 201 F.3d 1335, 1346 (11th Cir. 2000) ("A discriminating acquittal also can signal that the jury was able

21

to sift through the evidence properly."); United States v. Coy, 19 F.3d 629, 635 (11th Cir. 1994) ("Additionally, the verdicts in this case demonstrate the jury's ability to sift through the evidence and treat each defendant separately.").

And third, the unadmitted parts of the January 21, 2010 transcript did not affect the verdict because they were not highlighted in the government's case. See United States v. Miller, 255 F.3d 1282, 1285–86 (11th Cir. 2001) ("[W]e have repeatedly held harmless a prosecutor's single reference to the defendant's post-Miranda silence if it occurs during a trial at which the government's evidence was otherwise overwhelming. This is especially so where the prosecutor makes no further attempt to 'highlight' the defendant's exercise of Miranda rights either in questioning other witnesses or during closing argument." (citations omitted)). Those parts of the audio recording were never played for the jury. The government did not show the jury the second or third parts during its case. And the government did not rely on anything in the second and third parts of the transcript during its closing argument. As best as we can tell from the record, the jury, like Kim, never saw or knew that the second and third parts of the transcript were stapled to the first part.

Because the evidence was overwhelming on counts five and six, the acquittal on two counts showed that the jury was not prejudiced by the unadmitted portions of the January 21, 2010 transcript, and the transcript was not shown to the jury or used by the government, the district court did not abuse its discretion in denying

22

Kim's new trial motion.  See United States v. Vicaria, 12 F.3d 195, 198 (11th Cir. 1994) ("The decision to grant or deny the new trial motion is within the sound discretion of the trial court and will not be overturned on appeal unless the ruling is so clearly erroneous as to constitute an abuse of discretion." (alteration omitted)). We affirm.

**AFFIRMED.**