**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**William SALDARRIAGA,**
**Defendant–Appellant.**

**No. 91–5473.**

United States Court of Appeals,
Eleventh Circuit.

April 8, 1993.

Steven E. Kreisberg, Coconut Grove, FL, for defendant-appellant.

Dexter W. Lehtinen, Michael P. Sullivan, Anne M. Hayes, Linda Collins Hertz, U.S. Attys., Miami, FL, for plaintiff-appellee.

Before KRAVITCH and BIRCH, Circuit Judges, and CLARK, Senior Circuit Judge.

PER CURIAM:

Appellant William Saldarriaga was convicted of various cocaine-related offenses in violation of 21 U.S.C. §§ 959, 963. He was sentenced to a term of twenty years on each count, to run concurrently. For the following reasons, we affirm his conviction.

## I. BACKGROUND

### A. Facts Establishing the Conspiracy

The basis for the indictment against Saldarriaga focused on two months of activity in 1986 in Panama, Colombia, and Miami, Florida. The government, however, introduced evidence that linked Saldarriaga to a number of drug smuggling operations, beginning in the early 1980s. It was at this time that Saldarriaga met and established relationships with various people connected to the Medellin drug cartel.[1] One of these people, Marta Ochoa, was Saldarriaga's wife from 1982 to 1984.[2]

Government witnesses testified that early in 1986, Saldarriaga and his business partner, Ramon Navarro, became interested in purchasing a yacht named the KRILL from Ruben and Amed Paredes for the purpose of using the KRILL to import cocaine into the United States. The terms of the sale of the KRILL were finalized at a dinner in Panama City at the Tower Club, a restaurant owned by Cesar Rodriguez, who had owned the KRILL before selling it to the Paredes brothers. This dinner was attended by Saldarriaga, Navarro, Navarro's wife—Elizabeth Berbel—the Paredes and Jaime Gomez, Navarro's driver and bodyguard. The parties agreed to a sale price of $140,000, $100,000 of which Navarro paid in cash via two women in Coral Gables, Florida.

Early in March 1986, the Paredes brothers met with Rodriguez at the Tower Club and discussed the idea of using the KRILL to smuggle cocaine from Colombia to Miami. Ruben Paredes and Rodriguez both mentioned that the entire operation would be protected by General Manuel Antonio Noriega, the President of Panama. Later that same day, the three met with Saldarriaga, Navarro, Brian Davidow, and Gomez to discuss the smuggling plan. General Noriega spoke to the group by speaker phone and stated he would take care of getting the KRILL out of Panama.[3] During this meeting, plans were made to create stash compartments on the yacht for storage of the cocaine and for Saldarriaga to supply up to 350 kilograms of cocaine. The KRILL was to leave Panama on March 10 or 11.

Subsequent meetings with the same group, which now included Nubia Pino, were held to iron out the final details of the plan. Throughout these meetings, General Noriega was kept informed—via speaker phone—and he promised that everything was ready for the operation to proceed as

---

1. The "Medellin drug cartel" is a name created by the Drug Enforcement Agency to describe a group of drug traffickers who, although part of separate drug organizations, work together. *See United States v. Echavarria–Olarte,* 904 F.2d 1391, 1397 (9th Cir.1990).

2. Ms. Ochoa is a cousin of Jorge Luis Ochoa and Fabio Ochoa, who are known to be principals in the drug operations in Medellin.

3. The evidence showed that this promise by Noriega related to an outstanding tax deficiency of $12,000 owed by the Paredes brothers on the KRILL.

planned.[4] The principals also discussed a plan whereby guns would be exchanged for the cocaine.

The KRILL departed from Panama City on March 11, 1986. Documents revealed that aboard the ship were a carpenter named Efren Sosa–Ruiz, Jorge Palacios, who served as the ship's captain, and Manuel Sanchez–Vasquez. The KRILL first traveled to the city of Cristobal, Panama, where it stayed for three days. Sosa–Ruiz built the secret stash compartments and two boxes of guns were delivered and loaded onto the KRILL. The KRILL then sailed to Cartegena, Colombia. Colombia police observed the KRILL while it was docked in Cartegena. Police also conducted surveillance of Navarro, whom they knew to be a drug trafficker, and of Saldarriaga. The two were observed having frequent meetings in Cartegena. Saldarriaga and Navarro never travelled aboard the KRILL but would meet the ship at each destination.

Sanchez–Vasquez testified that he met with Gomez (Navarro's bodyguard) in Cartegena, who told him that the KRILL was to be taken to the island of San Andres. When the KRILL left Cartegena, the only member of the original crew to remain was Sanchez–Vasquez; he was joined by two Colombians, Captain Pena and Edison Garcia. En route to San Andres, the ship stopped at the Rosario Islands, where it was met by Saldarriaga and Navarro, who were guarded by men with machine guns. While the KRILL was docked at the Rosario Islands, burlap bags were loaded onto the boat and placed in the secret compartments. Navarro and Saldarriaga met there with Gabriel Toboada, who was seeking assistance in transporting marijuana and cocaine to the United States. Navarro and Saldarriaga advised Toboada of their plans

and invited him onto the KRILL. Navarro told Toboada that he was distributing cocaine for the Ochoa family of Medellin, Colombia.

The KRILL arrived at San Andres on March 20. Early in the morning of March 21, Colombian police boarded the KRILL, and awakened and arrested the crew—Pena, Garcia and Sanchez–Vasquez. During a search of the boat, police found four secret compartments containing 322 kilograms of cocaine and the photograph of General Noriega that bore his inscription.[5]

### B. Saldarriaga's Post–KRILL Statements

The government introduced evidence showing that Saldarriaga met Hector Jesus Velez in April 1986, just after the KRILL was seized. Saldarriaga told Velez all about the failed operation. Approximately six months later, Saldarriaga was in Miami, where he saw Hector Lopez, whom he knew from previous drug transactions, and told Lopez that he needed money to stay in the United States because he could not return to either Panama or Colombia in the wake of the KRILL fiasco. Saldarriaga also told Lopez that the cocaine seized on the KRILL had come from the Ochoa family and that high-ranking Panamanian officials were involved.

Three years later, Saldarriaga was arrested in Miami during a routine traffic stop. His former wife, Marta Ochoa, was with him in the vehicle. Two portable telephones and between $2000 and $3000 in cash were seized. While at the Miami Correctional Center (MCC), Saldarriaga told of his involvement in the KRILL venture to a number of inmates, including information regarding the participation of General Noriega and the Ochoa family. With one of

---

**4.** The group also decided to place on the KRILL a large photograph of General Noriega inscribed to Rodriguez as follows: "To my friend, Rodriguez, with affection." It was signed by General Noriega.

**5.** The government also introduced evidence regarding a trip taken by Rodriguez, Ruben Paredes and Pino to Medellin on March 11, where Pino was to introduce the men to Fabio Ochoa.

When family members of the three were unable to reach them, Navarro tried to track them down. From Cartegena, Navarro spoke with Doris Jeanette Fernandez, a friend of Pino, whom he told about the KRILL and the others' involvement in the plan. Ultimately, it was discovered that Ruben Paredes, Rodriguez and Pino were shot and killed in Medellin on or about March 13.

the inmates—Francisco Rodriguez–Milanes—Saldarriaga discussed whether or not he should cooperate with the government.[6] Saldarriaga also renewed his acquaintance with Velez (whom he met in 1986) and Toboada (whom he met on the Rosario Islands), both of whom were being held at MCC, and discussed his involvement in the KRILL venture with them.

## C. The Death of Ramon Navarro

Sometime after the seizure of the KRILL, Ramon Navarro began to cooperate with the United States Government. He testified on a number of occasions before the federal grand jury regarding the KRILL venture. When the indictment issued,[7] Navarro was not named. As both Saldarriaga and his co-defendant, Brian Davidow, expected Navarro to be a key government witness, they repeatedly sought *Brady*[8] and *Giglio*[9] material on Navarro from the government during the course of pre-trial discovery. Nevertheless, the government was not bound to call Navarro as a witness nor to disclose when, if at all, he would be called.[10]

Opening statements were made to the jury on the third day of trial.[11] During its opening statement, the government outlined the evidence it intended to present to the jury. In describing how the Paredes brothers decided to sell the KRILL to Navarro and Saldarriaga, the prosecutor remarked:

> While they [the Paredes] were engaged in negotiation with Fernando Burbrauder (ph) here, in Miami, another person arrived on the scene to complicate matters. That person was a Colombian named Ramon Navarro.
>
> Navarro was a notorious drug trafficker, and he decided that he wanted the "Krill" for his own purposes, which was smuggling cocaine into the United States. . . .
>
> These people got together, and the transaction changed radically from a trade of the "Krill" for the house in Kendall, to, now, just a straight sale of the "Krill" to the Colombian, Ramon Navarro.
>
> Ramon Navarro had two associates that he brought with him from Colombia to Panama. Their names were Jaime Gomez, who is named in these counts of the indictment with some co-defendants.
>
> The other associate of Ramon Navarro is the defendant on trial, William Saldarriaga.

(R. 13 at 479–80).

In his opening statement, counsel for Saldarriaga told the jury that the evidence would show that Saldarriaga had a legitimate business partnership with Navarro for purposes of buying the KRILL, and that Saldarriaga did not know about Navarro's intent to use the KRILL to smuggle cocaine into the United States. After setting out his theory of the case, counsel prepared the jury for how he would discredit Navarro as a government witness. For example, counsel stated:

---

**6.** On cross-examination by Saldarriaga's attorney, Rodriguez–Milanes testified that Saldarriaga told him, " 'I am not going to testify, neither against Pablo Escobar, nor against the Ochoa brothers because they are not going to allow any of my family to stay alive.' " (R. 31 at 2318).

**7.** Saldarriaga was named in two counts of a twelve-count indictment. The indictment covered fourteen people, including General Noriega, all of whom, save one, were tried separately from Saldarriaga. Saldarriaga was tried with Brian Davidow.

**8.** In *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the Supreme Court held that when defense counsel so requests, a prosecutor is required to disclose to the defense material, exculpatory evidence within its posses-

sion. "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. at 1196–97.

**9.** *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), requires prosecutors to disclose information regarding a witness' cooperation with the government.

**10.** This procedure differs from capital cases where the defendant is entitled to receive a copy of the government's witness list three days before trial begins. 18 U.S.C. § 3432.

**11.** After jury selection was completed, the trial court heard argument on a number of defense motions.

We don't intend to dispute that Mr. Saldarriaga had the misfortune of knowing Ramon Navarro, who everybody seems to call, "El Turco," and you'll be able to see for yourselves, in a couple of days, what Mr. Turco is, what he's like, whether he's a believable person, and what his motives are.…

Now, Ramon said nothing to him about any drugs being put on the boat, nothing to him about the fact that when Ramon and boat [sic] were in Panama, Ramon, apparently, had these secret compartments built someplace in the boat.

He told him nothing about the guns, and why should he tell him? Ramon Navarro, as you will see, is the kind .of person, who, if there was money to be made, would want to make it all for himself.

(R. 13 at 508, 511).[12]

The evening following the opening statements, Navarro was killed in an auto accident. This information was brought to the court's attention the next afternoon when the government made a motion requesting that defense counsel return to the government all *Jencks* material regarding Navarro.[13] Later that same day, defense counsel moved for a mistrial, arguing that (1) both the government and defense counsel had told the jury in opening statements that Navarro was "indelibly intertwined in the facts of this particular case" (R. 15 at 753); (2) defense counsel had centered its trial strategy around discrediting Navarro as the government's expected main witness; and (3) the timing of Navarro's death would raise an inference in the minds of the jurors that somehow one or both of the defendants was involved in causing the death.

The government countered by arguing that (1) despite discussing Navarro in its opening statement, it was not bound to call him as a witness; and (2) as experienced defense attorneys, counsel should have known that important witnesses are sometimes not used during the trial for various reasons. The court denied the motion for mistrial holding that (1) the government could introduce evidence showing that Navarro died in an accident and that there was no evidence of foul play;[14] (2) the defense's inability to carry out its strategy of cross-examining Navarro would not change in any future trial; and (3) the jury would be able to understand why, after learning of Navarro's death, the government .was unable to produce him as a witness.

Defense counsel then argued that the court should not give *any* instructions to the jury regarding Navarro's death because to do so would result in the jurors making improper assumptions about the cause of Navarro's death and the connection, if any, of the defendants to it.[15] The government countered that if no instructions were given, the jurors might conclude that the reason Navarro was not called was because "he was not going to help the [g]overnment, and he was going to testify to a pack of lies." (R. 15 at 770).

The court did instruct the jury as to Navarro's death a week into the trial, when his widow, Elizabeth Berbel, was called to testify. The court stated:

You will learn, as Mrs. Berbel's testimony proceeds, that Ramon Navarro, whose name you heard on several occasions, is dead. He died as a result of an automobile accident.

The death is in no way attributable to anyone involved in this lawsuit, and should not be considered in any way by you as having anything to do with this lawsuit. It was an automobile accident.

---

**12.** Counsel for co-defendant Brian Davidow also spent considerable time in his opening statement setting out his plan to discredit the expected testimony of Ramon Navarro.

**13.** Under the Jencks Act, 18 U.S.C. § 3500, the government is required to make available to the defense the prior recorded statements of witnesses for impeachment use. Although the statute does not require disclosure until the witness has testified on direct examination, the government had given the material to defense counsel on the first day of trial.

**14.** The court did indicate that if it became clear that foul play had been involved in causing Navarro's death, he would reconsider the motions for mistrial.

**15.** Defense counsel never moved for a continuance.

(R. 25 at 1733). The court did not advise the jury when Navarro died, although it would have been clear that he died sometime between the opening statements and the middle of the second week of trial.

## II. DISCUSSION

Saldarriaga raises three issues on appeal. First, he argues that the district court abused its discretion in failing to grant a mistrial after the death of Ramon Navarro. Second, he challenges the court's decision not to admit in evidence two Colombian passports. Finally, he contends that the trial court committed reversible error when it (a) allowed in testimonial evidence regarding Saldarriaga's connection to the Medellin drug cartel and the Ochoa family, and (b) failed to grant a mistrial based on that evidence. Based upon our review of the record, we conclude that the district court did not abuse its discretion in its evidentiary rulings relating to issues two and three and that these two issues do not merit further discussion. We address only the decision of the district court not to grant a mistrial after Navarro's death.

■ The decision whether to grant a mistrial is within the sound discretion of the trial court and will not be reversed unless the record reflects that the court abused that discretion. *United States v. Roper,* 874 F.2d 782 (11th Cir.), *cert. denied,* 493 U.S. 867, 110 S.Ct. 189, 107 L.Ed.2d 144 (1989). Saldarriaga's appeal focuses on the timing of Navarro's death. He argues that because both his and his co-defendant's counsel, in their opening statements, had promised the jury they would hear from Navarro, refusing him the opportunity to present his case to a "fresh and untainted jury" denied him the right to a fair trial and to the effective assistance of counsel.[16] Saldarriaga also contends that the court's instruction on Navarro's death, coupled with other evidence regarding the violent propensities of people involved in the Medellin drug trade, likely raised an inference of prejudice against him.

■ The fact that Saldarriaga centered his trial strategy around discrediting Navarro—and so articulated in the opening statement—is not an adequate basis for a mistrial. Despite the government's use of Ramon Navarro's name in its opening statement, it had not committed to using him as a testifying witness. Nor is there is any evidence in the record that either Saldarriaga or his co-defendant, Davidow, had been prepared to call Navarro as a defense witness.[17] Thus, Saldarriaga's argument on appeal that he would have called Navarro himself, had the government not done so, is not properly before us. *See United States v. Johnson,* 889 F.2d 1032, 1035 (11th Cir.1989).

■ Neither did the court abuse its discretion in instructing the jury regarding Navarro's death. If the court had not so informed the jury, the jurors might well have concluded that Navarro's expected testimony was so clearly not credible that the government decided not to call him. This would have impermissibly prejudiced the government. This court recently addressed this issue in *United States v. Accetturo,* 966 F.2d 631 (11th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1053, 122 L.Ed.2d 360 (1993). In that case, the district court had informed the jury of the death of an extortion victim who had cooperated with the police in the investigation of the case. The *Accetturo* panel wrote, in affirming the denial of a motion for mistrial based on similar jury instructions:

> The fact that [the witness] had died was relevant to explain the fact that [the witness] did not testify. Had the jury not been told, they might well have incorrectly concluded that [the witness] was incarcerated or was afraid to testify, fearing the impeaching cross-examination that the defense obviously would have mounted.

*Id.* at 637.

Contrary to Saldarriaga's assertion, this is not a case where the evidence or conduct

---

16. It was understood and agreed that any motions and arguments made by one defense counsel were to be considered as adopted by the other, unless otherwise stated. (R. 23 at 1428).

17. Appellant stated at oral argument that it was possible that his co-defendant, Davidow, had subpoenaed Navarro to appear on behalf of the defense. We have been unable to find any mention of this in the record.

complained of was "so highly prejudicial as to be incurable by the trial court's admonition." *United States v. Eubanks*, 876 F.2d 1514, 1517 (11th Cir.1989) (quoting *United States v. Smith*, 517 F.2d 710, 711 (5th Cir.1975)).[18] The jurors did not witness improper conduct nor did they hear erroneously admitted evidence. When the opening statements were made, Ramon Navarro was alive, and everyone was operating under the assumption that he would be alive for the duration of the trial. His death did not retroactively cause the opening statements to become so prejudicial so as to be incurable by appropriate jury instructions. Furthermore, this court recently affirmed the principle that " 'a jury is presumed to follow jury instructions.' " *United States v. Simon*, 964 F.2d 1082, 1087 (11th Cir. 1992) (quoting *Adams v. Wainwright*, 709 F.2d 1443, 1447 (11th Cir.), *cert. denied*, 464 U.S. 1063, 104 S.Ct. 745, 79 L.Ed.2d 203 (1984)).

For the foregoing reasons, Saldarriaga's conviction is AFFIRMED.

---

**18.** In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding circuit precedent all cases

---

decided by the former Fifth Circuit before October 1, 1981.

