**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Glenda NEWSOME, Shawn Lee Rawls,
Edwin Eugene Trout, Defendants–
Appellants.**

**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Kenneth BIRCHFIELD, James Anthony
Angerami, Defendants–Appellants.**

**Nos. 91–8663, 91–8866.**

United States Court of Appeals,
Eleventh Circuit.

Aug. 31, 1993.

---

Thomas Spraley, Avondale Estates, GA, for Newsome.

C. Gordon Statham, Decatur, GA, for Rawls.

Stanley M. Baum, Bates & Baum, Atlanta, GA, for Trout.

David S. Lipscomb, Duluth, GA, for Birchfield.

John J. Lieb, Atlanta, GA, for Angerami.

Carolyn J. Adams, Asst. U.S. Atty., Atlanta, GA, for U.S.

Before BLACK and CARNES, Circuit Judges, and RONEY, Senior Circuit Judge.

CARNES, Circuit Judge:

Glenda Newsome, Shawn Lee Rawls, Edwin Eugene Trout, Kenneth Birchfield, and James Anthony Angerami appeal their convictions and sentences which resulted from their involvement in a conspiracy to manufacture and possess with intent to distribute methamphetamine.[1] Defendants raise a raft of issues, all but three of which warrant no discussion. The three issues that do warrant discussion are these: 1) the contention of Newsome, Trout, and Rawls that the district court erred in denying their motions for a mistrial based on alleged prejudice from questions the prosecutor asked; 2) the contention of all the defendants that the district court erred in calculating under U.S.S.G. § 2D1.1 the amount of methamphetamine involved in the conspiracy; and 3) Angerami's contention that the district court erred in sentencing him to the statutory ten year maximum term of imprisonment on the firearms possession charge, a term which Angerami argues exceeds the Guideline range for this offense.

In the final analysis, we vacate the sentences of Newsome, Rawls, and Trout, because the district court erred in treating as methamphetamine the gross weight of unusable sludge mixtures which contained only trace amounts of methamphetamine, and with these three defendants that error may have made a difference in the sentences. As to the other two defendants, it did not. We remand the cases of Newsome, Rawls, and Trout for resentencing in accordance with this opinion. We find no other error in the district court's judgments.

---

1. All defendants were convicted on Count I of an eight-count indictment which alleged a conspiracy to manufacture and to possess with intent to distribute methamphetamine in violation of 21 U.S.C. § 846. Defendants Newsome, Rawls, Trout, and Birchfield were also convicted on Count II, manufacturing methamphetamine in violation of 21 U.S.C. § 841, and Count III, possession with intent to distribute methamphetamine in violation of 21 U.S.C. § 841. Birchfield also was convicted on Count VII, disposal of hazardous waste without a permit in violation of 42 U.S.C. § 6928(d)(2)(A). Angerami was also convicted on Count VIII, possession of an unregistered machine gun in violation of 26 U.S.C. § 5861(d).

## I. BACKGROUND

In August of 1990, Wanda Palacio informed Drug Enforcement Administration agents that her recent acquisition of a large quantity of ephedrine in Puerto Rico was on behalf of defendants Angerami and Birchfield. According to Palacio, James Angerami, and Kenneth Birchfield intended to use the ephedrine in the manufacture of methamphetamine. Palacio agreed to cooperate with the Government in its investigation.

The investigation led to the Atlanta area where Angerami and Birchfield were businessmen. The Government recorded telephone calls between Palacio and Birchfield during which the purchase of additional ephedrine was discussed. The Government also monitored the movements of Angerami and Birchfield and was led to Gloria Newsome, her common-law husband Edwin Trout, and Birchfield's secretary, Shawn Rawls.

On September 25, 1990, Birchfield was arrested shortly after leaving the residence of Newsome and Trout. After being advised of his rights, Birchfield admitted that he had methamphetamine oil in his car and that he was going elsewhere to crystallize it. A container holding 4.12 kilograms of methamphetamine oil was recovered from the trunk of Birchfield's car. According to the unrebutted statement of the Government's expert chemist, this volume of oil would have yielded 4.99 kilograms of methamphetamine. That 4.99 kilogram amount was included in the sentencing computations for all defendants.

On the same day Birchfield was arrested, Angerami was arrested as he was leaving a convenience store. A small amount of a mixture of methamphetamine and cocaine was recovered from Angerami's person and a loaded Smith & Wesson .357 revolver was found in his car. In a subsequent search of Angerami's business pursuant to a warrant, agents found chemicals and apparatus for use in processing methamphetamine, as well as a bucket containing 3.08 kilograms of "whitish-yellowish solid material" containing trace amounts of methamphetamine. On the ground behind a structure on the premises, agents also found approximately 7.6 kilograms of a "brown sludge" containing trace amounts of methamphetamine. The 3.08 kilogram amount and the 7.6 kilogram amount were included as methamphetamine in the sentencing computations for all defendants.

The Government also executed a search warrant at Angerami's residence where agents found an M14 rifle capable of automatic fire and ammunition for the weapon. Angerami was convicted on a separate count for possession of the unregistered machine gun in violation of 26 U.S.C. § 5861(d).

One week into the trial of all five defendants, the district court granted Angerami and Birchfield's motion for a mistrial, but denied the mistrial motions of the other three defendants. The motions were based on the risk of prejudice resulting from the Government's questioning of Birchfield about his association with an individual whom the Government erroneously stated had been convicted on drug trafficking charges. The trial of Newsome, Trout, and Rawls continued and concluded with their convictions. After the mistrial was declared as to them, Birchfield and Angerami were retried together and convicted. All the cases were consolidated into this appeal.

The common count on which all five defendants were convicted is Count I, which alleged a conspiracy to manufacture and to possess with intent to distribute methamphetamine. *See also* n. 1, above. At the sentencing hearings of the defendants, the district court included the weights of the various substances we have described previously in its calculation of the total weight of methamphetamine for sentencing purposes. This led the court to conclude that the conspiracy involved at least ten kilograms of methamphetamine and that resulted in a base offense level of 36 under U.S.S.G. § 2D1.1(a)(3) and (c).

## II. DISCUSSION

### A. THE MOTIONS FOR MISTRIAL OF NEWSOME, RAWLS, AND TROUT

At the joint trial of all five defendants, the prosecutor cross-examined Birchfield about his relationship with a business associate, Bruce Hunt.

Q: And you also mentioned that you'd been in business with a Bruce Hunt, is that correct?

A: I was with a—with a deal with him in a—on an oil thing, on an oil lease deal.

Q: And how familiar are you with Bruce Hunt? How close to him are you?

A: I've known Bruce for several years. He came in my shop for several years.

Q: Were you aware that Mr. Hunt went to prison for drugs?

A: I knew that he got arrested several years ago, yes, ma'am.

Earlier in his direct testimony, Birchfield had stated that the "oil lease deal" was a partnership between Hunt, Angerami, Birchfield, and others. None of the defendants in this case, except for Angerami and Birchfield, were mentioned as having been involved either in this "deal" or with Hunt in any other way.

There was no contemporaneous objection to this line of questioning. However, at the end of the trial day, Angerami moved for a mistrial, a motion subsequently joined by all of the other defendants. Two days later at the hearing on this motion, the prosecutor revealed that, in the interim, she had learned that Hunt had in fact never been convicted. Holding that the questioning had been improper, the court declared a mistrial for Angerami and Birchfield:

> There is no doubt as to the impropriety of the evidence. I think it's very clear as to Mr. Birchfield; that is, because he was the one that was asked about it. It's less clear in my judgment, the connection with the jury as to Mr. Angerami, but it's there because Mr. Hunt at least was one of the persons with whom they were all—there was testimony they were business partners.

However, the court denied the motion as to the other three defendants, because the court found that "there's been no testimony from anybody that any of the other three defendants have any connection whatsoever or have had any connection whatsoever with Mr. Hunt." Newsome, Rawls, and Trout contend that it was error for the district court not to grant a mistrial as to them.

The former Fifth Circuit passed on to us "the long established rule that a defendant's guilt may not be proven by showing he associates with unsavory characters." *United States v. Singleterry,* 646 F.2d 1014, 1018 (5th Cir. Unit A June 1981), *cert. denied,* 459 U.S. 1021, 103 S.Ct. 387, 74 L.Ed.2d 518 (1982); *see also United States v. Ochoa,* 609 F.2d 198, 204–06 (5th Cir.1980). However, "[t]he decision whether to grant a mistrial is within the sound discretion of the trial court and will not be reversed unless the record reflects that the court abused that discretion." *United States v. Saldarriaga,* 987 F.2d 1526, 1531 (11th Cir.1993).

We find that the district court was correct in concluding that no evidence linked Newsome, Rawls, or Trout with Bruce Hunt. Indeed, Newsome concedes in her brief that "no evidence connected Newsome with Mr. Hunt." The prosecutor's reference to Hunt was confined to the above-quoted colloquy. The intervening testimony between this colloquy and the declaration of a mistrial was limited to the conclusion of Birchfield's cross-examination and the voir dire of the defense's expert, Dr. James Woodford. The subject of the "oil lease deal" involving Hunt was not revisited during the intervening testimony or at any other time.

We conclude that the rights of Newsome, Rawls, and Trout were unaffected by the Government's questions regarding Bruce Hunt. The district court's denial of their motions for mistrial was not an abuse of discretion.

## B. WEIGHT OF METHAMPHETAMINE IN COMPUTING THE BASE OFFENSE LEVEL

### 1. *Introduction*

■ The defendants contend that the district court erred in including the weight of three unusable "mixture[s] or substance[s]" seized following the arrests in this case: 1) the 4.12 kilograms of methamphetamine oil (which the court included as 4.99 kilograms of methamphetamine) that were discovered

in the trunk of Birchfield's car;[2] 2) the 3.08 kilograms of "sludge" containing trace amounts of methamphetamine that were seized in a building at Angerami's business; and 3) the 7.6 kilograms of "sludge" containing trace amounts of methamphetamine that were discovered on the ground behind a structure on the premises of Angerami's business. According to the defendants, the district court's action was prohibited by controlling authority of this Court. ·

Chapter Two, Part D of the Sentencing Guidelines represents the Sentencing Commission's effort to craft a comprehensive scheme for sentencing defendants convicted of offenses involving drugs. This appeal requires us to consider the following explanatory note to the Drug Quantity Table found in U.S.S.G. § 2D1.1(c): "Unless otherwise specified, the weight of a controlled substance set forth in the table refers to the entire weight of any mixture or substance containing a detectable amount of the controlled substance."

The defendants' contention presents a variation of an issue that we addressed in our decisions in *United States v. Rolande–Gabriel*, 938 F.2d 1231 (11th Cir.1991) and *United States v. Bristol*, 964 F.2d 1088 (11th Cir.1992). Specifically, we must decide whether the rule we announced in *Rolande–Gabriel*, "that the term 'mixture' in U.S.S.G. § 2D1.1 does not include unusable mixtures," *Rolande–Gabriel*, 938 F.2d at 1238, is equally applicable where the charge is conspiracy to possess and manufacture a controlled substance, and where the "mixture or substance" in question is either the controlled substance at a preliminary stage of production or a manufactured substance discarded as waste due to poor quality. This issue continues to plague courts because, although the commentary to § 2D1.1 instructs that " '[m]ixture or substance' as used in this guideline has the same meaning as in 21 U.S.C. § 841," U.S.S.G. § 2D1.1, comment. (n. 1), neither

that statute nor the Guidelines defines those words.

In *Rolande–Gabriel*, the district court had based the sentence of a defendant who pled guilty to a charge of importation of cocaine on 241.6 grams of liquid containing cocaine even though only 72 grams of the mixture were usable. Rejecting the "absurdity and irrationality" of this approach, we held "that the term 'mixture' in U.S.S.G. § 2D1.1 does not include unusable mixtures." *Rolande–Gabriel*, 938 F.2d at 1238. In so holding, we distinguished the Supreme Court's decision in *Chapman v. United States*, —— U.S. ——, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991), which held that the combined weight of sheets of blotter paper impregnated with LSD should be used in calculating the defendants' sentences:

> While LSD is ready for sale, use, or consumption when it is placed on standard carrier mediums such as blotter paper, gel, or sugar cubes, the cocaine mixture in this case was obviously unusable while mixed with the liquid waste material.... The [Supreme] Court stated the inclusion of the weight of standard carrier mediums is rational because standard carrier mediums facilitate the use, marketing and access of LSD and other drugs. The liquid waste in this case, however, did not accomplish any of these purposes. The inclusion of the carrier medium of unusable liquid waste in this case for sentencing is irrational.

*Rolande–Gabriel*, 938 F.2d at 1237 (citation omitted).

More recently, in *United States v. Bristol*, we held *Rolande–Gabriel* to be "binding authority" and "dispositive" of the issue of whether the total weight of cocaine-laden wine that defendants were attempting to import into the United States from Panama should be considered for sentencing purposes. The total weight of the wine-cocaine mixture was 10.705 kilograms from which 4.095 kilograms of cocaine were extracted.

---

2. Angerami argues that the Government's expert testified that only seven pounds (3.18 kilograms) of methamphetamine oil were seized. However, this testimony was only referring to Government Exhibit 76. The Government's expert testified earlier that the oil seized from Birchfield's car was divided into Exhibits 76 and 198 "for court purposes." As the Presentence Reports make clear, the gross weight of the container found in Birchfield's car was 13.2 kilograms. The net weight of the methamphetamine oil was 4.12 kilograms from which 4.99 kilograms of methamphetamine hydrochloride could be produced.

The *Bristol* panel, after noting a split among the circuits that have interpreted the *Chapman* decision,[3] recognized that it was bound by *Rolande–Gabriel* and held that the sentencing court "should not have included the weight of the wine." 964 F.2d at 1090.

The Government insists that *Rolande–Gabriel* and *Bristol* are inapposite because the present case involves a conspiracy to manufacture a controlled substance. According to the Government, the defendants should be charged with "the entire weight of any mixture or substance containing a detectable amount of controlled substance," U.S.S.G. § 2D1.1(c), n. *, regardless of whether the "mixture[s] or substance[s]" were the finished product, or were goods in progress at an intermediate stage of production, or were merely waste product discarded for its demonstrably poor quality.

It is well-established that "[t]he determination of the quantity of drugs involved in a conspiracy for the purpose of sentencing is a factual determination subject to the clearly erroneous standard." *United States v. Davis*, 902 F.2d 860, 861 (11th Cir.1990); *see also United States v. Griffin*, 945 F.2d 378, 383 (11th Cir.1991) (same), *cert. denied,* — U.S. ——, 112 S.Ct. 1958, 118 L.Ed.2d 561 (1992). The same standard applies to review of a district court's estimate of the production capability or capacity of a drug operation. *United States v. Bertrand*, 926 F.2d 838, 846 (9th Cir.1991). However, "[w]e review *de novo* the district court's legal interpretation of the Sentencing Guidelines." *United States v. Perez*, 992 F.2d 295, 296 (11th Cir.1993); *see also United States v. Rodriguez*, 975 F.2d 999, 1004 (3d Cir.1992) ("The question of whether the combination of cocaine and boric acid constituted a 'mixture or substance' under section 2D1.1 of the Sentencing Guidelines is a legal question over which we exercise plenary review.").

### 2. The 4.12 Kilograms of Methamphetamine Oil Found in Birchfield's Automobile

■ Turning first to the methamphetamine oil found in the trunk of Birchfield's car, we find no error in the district court's inclusion of 4.99 kilograms which represented the projected yield of the 4.12 kilograms of oil that was discovered. We recently noted that because "the objects of attempts and conspiracies often remain unconsummated at the time of arrest, the United States Sentencing Commission instructs sentencing courts to 'approximate the quantity of the controlled substance' that 'reflect[s] the scale of the offense.'" *United States v. Hyde*, 977 F.2d 1436, 1440 (11th Cir.1992) (quoting U.S.S.G. § 2D1.4, comment. (n. 2)[4], *cert. denied,* — U.S. ——, 113 S.Ct. 1948, 123 L.Ed.2d 653 (1993). In *Hyde*, we approved the district court's finding that 110 pounds of phenylacetic acid, a precursor chemical for methamphetamine, could be processed into 30 kilograms of methamphetamine. *Id.* Other courts of appeals have adopted the same approach. *See, e.g., United States v. Beshore*, 961 F.2d 1380, 1383 (8th Cir.) ("Calculation of amount of methamphetamine that could have been produced from the quantity of precursor chemicals is proper under the sentencing guidelines."), *cert. denied,* — U.S. ——, 113 S.Ct. 241, 121 L.Ed.2d 175, *and cert. denied,* — U.S. ——, 113 S.Ct. 243, 121 L.Ed.2d 177 (1992); *United States v. Havens*, 910 F.2d 703, 705 (10th Cir.1990) ("[T]he trial court, upon proper testimony, may estimate the ultimate quantity of produceable drugs. This estimate should be equal to the amount of drugs produceable if the precursor chemicals possessed by the defendants were combined with proportionate amounts of the missing ingredients including processing equipment."), *cert. denied,* 498 U.S. 1030, 111 S.Ct. 687, 112 L.Ed.2d 678 (1991).

---

**3.** *See generally* Richard Belfiore, Annotation, *Under What Circumstances Should Total Weight of Mixture or Substance in Which Detectable Amount of Controlled Substance Is Incorporated Be Used in Assessing Sentence Under United States Sentencing Guideline § 2D1.1—Post–Chapman Cases,* 113 A.L.R. Fed. 91 (1993).

**4.** The quoted portions of this Guideline commentary are now found at U.S.S.G. § 2D1.1, comment. n. 12. *See* U.S.S.G. App. C, amend. 447 (November 1, 1992).

We see no principled distinction for sentencing purposes between "precursor chemicals" destined for conversion into a controlled substance and combinations of those chemicals that have been partially processed and are closer to the finished product at the time they are discovered. We further note that none of the defendants offered any evidence to rebut the preliminary finding contained in the Presentence Reports that, based on information provided by a DEA chemist, "the net weight of the methamphetamine oil was 9.09 pounds [4.12 kilograms], and that after the oil had been properly dried it would have produced 11 pounds [4.99 kilograms] of methamphetamine hydrochloride." Thus, the district court's adoption of this preliminary finding was not clearly erroneous. *See United States v. Wise,* 881 F.2d 970, 972–73 (11th Cir.1989).

3. *The 3.08 and 7.6 Kilograms of "Sludge" Found at Angerami's Business*

The "mixture[s] or substance[s]" seized in the search of Angerami's business present a different question from the methamphetamine oil found in Birchfield's car. There is no suggestion that the 3.08 and 7.6 kilogram quantities found at the business were goods in progress that would have eventually become some amount of marketable methamphetamine. On the contrary, the district court found that these mixtures had been manufactured by the conspirators but had been "poured out or whatever" due to the mixtures' poor quality. The Government's chemist testified at trial that these mixtures were not only unusable, but also toxic. Notwithstanding this testimony, and the fact that the mixtures contained less than one percent methamphetamine, the district court included the total weights of these mixtures because it found that "had [the defendants] been more proficient in their manufacturing process [there] would I guess have been methamphetamine on the market."

Whether discarded materials from a conspiracy's drug manufacturing process should be counted for sentencing purposes is an issue of first impression in this Circuit. The one court of appeals that has squarely addressed this question concluded that the entire weight of a "liquid [that] was probably a waste product left over from the methamphetamine manufacturing process" should be counted for sentencing. *United States v. Walker,* 960 F.2d 409, 412 (5th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 443, 121 L.Ed.2d 362 (1992). The *Walker* court found support for its conclusion in Fifth Circuit precedent as well as the Supreme Court's decision in *Chapman,* but conceded that *Chapman* "did not speak to the issue of whether the weight of liquid waste containing methamphetamine should serve as a basis for computing a defendant's offense level." *Id.* If *Walker* were an Eleventh Circuit decision, it might compel affirmance of the district court's action in this case. But *Walker,* unlike *Rolande–Gabriel,* is not a decision we are required to follow.

The district court adopted the conclusion of the probation officer who attempted to distinguish *Rolande–Gabriel* by observing that "the yellow sludge is not a combination of methamphetamine and an unusable carrier medium; the yellow sludge is the product of an attempt to manufacture methamphetamine." In *Rolande–Gabriel,* however, our focus was on the rationality of sentencing drug defendants based on unusable waste materials. As we explained, "it is fundamentally absurd to give an individual a more severe sentence for a mixture which is unusable and not ready for retail or wholesale distribution while persons with usable mixtures would receive far less severe sentences." *Rolande–Gabriel,* 938 F.2d at 1237. Likewise, it makes no sense to sentence these defendants based on the weights of materials that would never find their way to methamphetamine consumers.

As with the methamphetamine oil, the district court was required to "approximate the quantity of the controlled substance" if it found that "the amount seized d[id] not reflect the scale of the offense." U.S.S.G. § 2D1.1, comment. (n. 12). But there is no indication in the record that this was the court's intent with respect to the two substances found at Angerami's business. On remand, if the district court chooses to pursue the approximation approach, it should

enter findings of fact to support its determination. The court may consider, but is not limited to, those factors identified in the commentary to § 2D1.1 which may be relevant in this case: "the price generally obtained for the controlled substance, financial or other records, similar transactions in controlled substances by the defendant, and the size or capability of any laboratory involved." *Id.*

■ Because the sludge substances in this case were unusable, we find that the rationale of *Rolande–Gabriel* controls the disposition of this issue—the gross weight of "unusable mixtures" should not be equated with the weight of a controlled substance for sentencing purposes. We conclude the district court's inclusion of the total weight of the two substances found at Angerami's business was clear error. We therefore vacate the sentences of Newsome, Rawls, and Trout and remand for resentencing. While inclusion of these weights in the sentence calculations of Birchfield and Angerami was also improper, that error does not require that we remand their two cases for resentencing. Birchfield and Angerami were each held responsible for 28.76 kilograms of methamphetamine. Elimination of the 3.08 and 7.6 kilogram quantities in question from the sentencing equation still would have left these defendants accountable for a quantity of methamphetamine equal to or greater than 10 kilograms but less than 30 kilograms, with the same resulting base offense level of 36. Because their base offense levels are unaffected by our holding, and because both Birchfield and Angerami were sentenced to the lowest possible terms of imprisonment based on their offense levels and criminal history categories, we need not remand. *See, e.g., Williams v. United States,* — U.S. —, —, 112 S.Ct. 1112, 1121, 117 L.Ed.2d 341 (1992) ("If the party defending the sentence persuades the court of appeals that the district court would have imposed the same sentence absent the erroneous factor, then a remand is not required...").

## C. ANGERAMI'S 120–MONTH SENTENCE ON THE FIREARM POSSESSION CHARGE

■ In addition to sentencing Angerami to 292 months of incarceration on the drug conspiracy conviction, the district court also sentenced him to a concurrent 120–month term of imprisonment for the firearm possession conviction. That ten year sentence is the statutory maximum for this offense under 26 U.S.C. § 5871. Angerami argues for the first time on appeal that the district court erred in sentencing him to the statutory maximum term of imprisonment on this charge because that ten year term far exceeds the Guideline range for this offense. The Government correctly responds that Angerami waived his appeal of this sentence.

After the firearm possession sentence was imposed, Angerami was given the opportunity to object but failed to do so. *See United States v. Jones,* 899 F.2d 1097, 1103 (11th Cir.) ("Where the district court has offered the opportunity to object and a party is silent or fails to state the grounds for objection, objections to the sentence will be waived for purposes of appeal...."), *cert. denied,* 498 U.S. 906, 111 S.Ct. 275, 112 L.Ed.2d 230 (1990), *overruled on other grounds by United States v. Morrill,* 984 F.2d 1136 (11th Cir. 1993) (en banc). Angerami now argues that review of his sentence is not precluded under *Jones* because he contends that the sentence imposed was manifestly unjust. This Court has equated the manifest injustice inquiry with review under the plain error doctrine. *United States v. Neely,* 979 F.2d 1522, 1523 (11th Cir.1992) ("We will only consider [sentence] objections raised for the first time on appeal under the plain error doctrine to avoid 'manifest injustice.'"). Because we find no error in the sentence imposed by the district court, there can be no plain error.[5]

Angerami's argument is based on the incorrect assumption that multiple-count sentencing is conducted in the same manner as single-count sentencing. That assumption overlooks extensive Guidelines provisions de-

---

**5.** Although the district court failed to explain the Guidelines basis for the sentence on the firearm conviction, "the court's summary disposition ... has not precluded meaningful appellate review."

*United States v. Wise,* 881 F.2d 970, 973 (11th Cir.1989); *see also United States v. Villarino,* 930 F.2d 1527, 1528–29 (11th Cir.1991) (same).

voted to sentencing on multiple counts. *See* U.S.S.G. Ch. 3, Pt. D; U.S.S.G. Ch. 5, Pt. G. *Under these provisions, the sentencing court must first* "determin[e] a single offense level that encompasses all the counts of which the defendant is convicted." U.S.S.G. Ch. 3, Pt. D, intro. comment. The court then must "determin[e] the specific sentence to be formally imposed on each count in a multiple-count case." U.S.S.G. § 5G1.2, comment. If "one of the counts will have a statutory maximum adequate to permit imposition of the total punishment as the sentence on that count[,] [t]he sentence on each of the other counts will then be set at the lesser of the total punishment and the applicable statutory maximum, and be made to run concurrently with all or part of the longest sentence." *Id.*.

The district court adopted a total adjusted offense level of 40 for the conspiracy count based on the following: a base offense level of 36, plus a 2–level increase for possession of a dangerous weapon (U.S.S.G. § 2D1.1(b)(1)), and a 2–level enhancement for obstruction of justice (U.S.S.G. § 3C1.1). The court also adopted a total adjusted offense level of 18 for the firearm possession charge based on a base offense level of 16 and a 2–level enhancement for obstruction of justice (U.S.S.G. § 3C1.1). Applying the multiple count aggregation rules of Guidelines Chapter 3, Part D, the court found a total combined adjusted offense level of 40. With a criminal history category of I, this yielded a Guideline range of 292–365 months. The court then imposed a sentence of 292 months imprisonment on Angerami.

This is not the end of the story, however, because the court was required to specify the "sentence to be formally imposed on each count in a multi-count case." U.S.S.G. § 5G1.2, comment. This requires application of § 5G1.2 which provides as follows:

(a) The sentence to be imposed on a count for which the statute mandates a consecutive sentence shall be determined and imposed independently.

(b) Except as otherwise required by law (*see* § 5G1.1(a), (b)), the sentence imposed on each other count shall be the total punishment as determined in accor-

dance with Part D of Chapter Three, and Part C of this Chapter.

(c) If the sentence imposed on the count carrying the highest statutory maximum is adequate to achieve the total punishment, then the sentences on all counts shall run concurrently, except to the extent otherwise required by law.

(d) If the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment, then the sentence imposed on one or more of the other counts shall run consecutively, but only to the extent necessary to produce a combined sentence equal to the total punishment. In all other respects sentences on all counts shall run concurrently, except to the extent otherwise required by law.

Helpful to the proper application of this section is the following commentary:

The combined length of the sentences ("total punishment") is determined by the adjusted combined offense level. To the extent possible, the total punishment is to be imposed on each count. Sentences on all counts run concurrently, except as required to achieve the total sentence, or as required by law.

. . . .

Usually, at least one of the counts will have a statutory maximum adequate to permit imposition of the total punishment as the sentence on that count. The sentence on each of the other counts will then be set at the lesser of the total punishment and the applicable statutory maximum, and be made to run concurrently with all or part of the longest sentence.

U.S.S.G. § 5G1.2, comment. We have explained that this "commentary to the section describes exactly what to do in [a] situation, where 'one of the counts [has] a statutory maximum adequate to permit imposition of the total punishment as the sentence on that count.'" *United States v. Woodard*, 938 F.2d 1255, 1257 (11th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1210, 117 L.Ed.2d 449 (1992). The district court in this case followed this Guideline and commentary to the letter.

Angerami's "total punishment," as determined by his adjusted combined offense level, is 292 months. "To the extent possible," this sentence should have been imposed on both Count I and Count VIII. U.S.S.G. § 5G1.2 comment. It was not possible, however, because of the statutory maximum of ten years for the firearm possession charge in Count VIII. *See* 26 U.S.C. § 5871. Therefore, the district court properly set the sentence on Count VIII at "the lesser of the total punishment and the applicable statutory maximum"—ten years. U.S.S.G. § 5G1.2 comment. Because the conspiracy count had "a statutory maximum adequate to permit imposition of the total punishment as the sentence on that count," the court correctly ordered the 120-month sentence imposed on the firearms possession count to run concurrently with the 292-month sentence imposed on the conspiracy count. *Id.; see, e.g., United States v. Analla,* 975 F.2d 119, 127–28 (4th Cir.1992) (In sentencing on the counts of murder, assault, robbery, and use of a firearm in a felony, "[t]he district court ... did not err in imposing concurrent sentences [with the life sentence for murder] of the statutory maximum for the robbery count and the assault count."), *cert. denied,* — U.S. ——, 113 S.Ct. 1853, 123 L.Ed.2d 476 (1993).

We do not mean to imply that plain error exists whenever there is error; that is not what "plain error" means. *See, e.g., United States v. Chaney,* 662 F.2d 1148, 1152 (5th Cir. Unit B 1981) ("An error is plain if it is 'so obvious that the failure to notice it would seriously affect the fairness, integrity, or public reputation of judicial proceedings.' "). The converse is true, however. Where there is no error, there can be no plain error. The district court applied the applicable Guidelines precisely as written. Thus, the sentence imposed on Angerami for the firearms possession conviction is not in error, plain or otherwise. It is due to be affirmed.

## III. CONCLUSION

We AFFIRM the convictions of all defendants. We VACATE the sentences imposed on appellants Newsome, Rawls, and Trout under Count I of the indictment and REMAND for resentencing consistent with this opinion. In all other respects, the judgments of and sentences imposed by the district court are AFFIRMED.