[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

**FILED**
**U.S. COURT OF APPEALS**
**ELEVENTH CIRCUIT**
**MAY 02, 2001**
**THOMAS K. KAHN**
**CLERK**

No. 00-11254

D.C. Docket No. 99-00130 CR-S-NE

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

RICHARD LEE BLAYLOCK, JR.,

Defendant-Appellant.

_____

No. 00-11255

_____

D. C. Docket No. 99-00130-CR-S-NE

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ALEXANDER PETRILLO,
a.k.a. Alexander Pertillo,

Defendant-Appellant.

Appeals from the United States District Court
for the Northern District of Alabama

**(May 2, 2001)**

Before WILSON and COX, Circuit Judges, and RYSKAMP*, District Judge.

RYSKAMP, District Judge:

In these consolidated appeals, Appellants, Alexander Petrillo ("Petrillo") and Richard L. Blaylock ("Blaylock"), appeal criminal sentences imposed on them by the United States District Court for the Northern District of Alabama. Appellants both pled guilty to possession of pseudoephedrine, acetone, and ethyl ether with the intent to manufacture methamphetamine, in violation of 21 U.S.C. § 841(d)(1). The district court sentenced Petrillo to 78 months of imprisonment and a $4,000 fine and Blaylock to 60 months of imprisonment and a $4,000 fine. For the reasons stated herein, we affirm.

---

*Honorable Kenneth L. Ryskamp, U.S. District Judge for the Southern District of Florida, sitting by designation.

# I. BACKGROUND

Because this appeal focuses on the district court's sentencing of Appellants, only a summary of the facts material to the sentencing issues is required. In February 1999, the Madison County Drug Task Force of Huntington, Alabama, received a tip that drugs were being sold from a location occupied by Appellants. Based upon that tip and a controlled cocaine purchase at that location, a search warrant was executed on March 24, 1999. Appellants were present at the time of the search. Among other contraband, the agents' search uncovered an outbuilding in which Appellants were operating a clandestine methamphetamine laboratory. From this laboratory agents recovered numerous items and chemicals commonly used in the production of methamphetamine, including lithium batteries, filters, ethyl ether, glassware, salt, acetone, sulfuric acid, nitric acid, and scales. On September 16, 1999, Appellants were charged in a two count superseding indictment with conspiracy to possess with the intent to distribute methamphetamine (Count I), and possession of precursor chemicals with the intent to manufacture methamphetamine (Count II).

The agents submitted to the Drug Enforcement Administration forensic laboratory photographs of the items found at Appellants' laboratory, along with three chemicals found at the scene. The agents submitted 1) a jar containing a

liquid and solid substance that had separated[1] (exhibit 7); 2) 21.9 grams of

pseudoephedrine in powder form (exhibit 8); and 3) two boxes containing sixty

blue tablets (exhibit 9). The DEA lab determined that exhibit 7 contained 1.6

grams of methamphetamine, that exhibit 8 contained 13.8 grams of pure

pseudoephedrine, and that exhibit 9 contained 14 grams of pure pseudoephedrine.

The DEA chemist, Dr. Jennifer L. Trevor[2], determined that, assuming a 100%

theoretical yield, Appellants could have produced up to 25.6 grams of d-

methamphetamine.

On October 14, 1999, and November 8, 1999, Petrillo and Blaylock,

respectively, pled guilty to Count II of the superceding indictment. On December

16, 1999, and February 29, 2000, the district court held hearings on the sentencing

of Appellants. At sentencing, the government called Dr. Trevor to testify as to the

amount of methamphetamine Appellants could have produced at their clandestine

lab. Dr. Trevor testified that the precursor chemicals and other manufacturing

---

[1] The Agents erroneously poured off the liquid portion of this exhibit before submitting it to the DEA for analysis. Appellants argue that the agents' error affected the calculation of drug quantity and, in turn, their respective sentences. The Court finds no evidence or authority to support this argument, for despite such error other precursors remained upon which drug quantity could be calculated under the Guidelines.

[2] Dr. Trevor at the time of sentencing had been employed with the DEA Forensic Laboratory for two years and had evaluated "hundreds" of precursor chemicals used in the manufacture of methamphetamine.

4

items found at Appellants' lab were consistent with the Birch Reduction method of manufacturing methamphetamine. Dr. Trevor testified that the Birch Reduction method of production has reported yields in excess of 95%. Dr. Trevor stated that, assuming a 100% theoretical yield, Appellants' lab could have produced up to 25.6 grams of methamphetamine. Dr. Trevor admitted that as conditions change from day to day, a methamphetamine lab will not produce the same actual yield, and agreed that such variations could vary greatly "from one percent up to 100 percent." (Sent. Tr. Vol. III at 32). When asked whether she could estimate the actual yield of Appellants' lab based upon the information and evidence available to her, Dr. Trevor stated: "I can only report what the 100 percent theoretical yield would be." *Id.* at 27. The district court pressed Dr. Trevor further on the issue of actual yield, asking her whether she had any opinion "with a reasonable degree of certainty . . . as to the yield that these amounts could have produced with the use of the laboratory equipment [she] saw," to which Dr. Trevor responded "No, sir." *Id.* at 48-49. The district court then tried to narrow Dr. Trevor's estimate of actual yield, asking "Your best estimate, then, is the 95 percent figure?," but the government's expert disagreed, responding "No. I said my only estimation would be the 100 percent theoretical yield." *Id.* at 49. Appellants did not challenge at sentencing Dr. Trevor's calculation of the theoretical maximum yield.

Appellants offered the expert testimony of Dr. Boon Loo, Associate Professor of Chemistry at the University of Alabama at Huntsville. Dr. Loo, who is not a forensic chemist, testified that he agreed with Dr. Trevor's analysis of the precursor chemicals as well as her estimate of 25.6 grams of methamphetamine assuming a 100% theoretical yield. Dr. Loo also admitted that he could not state with reasonable scientific certainty what the lab's actual yield would be. The district court asked Dr. Loo whether he had "any opinion . . . with a reasonable degree of certainty based on [his] education, training and experience as to the likely yield" based upon the equipment and chemicals being used at Appellants' methamphetamine lab, to which Dr. Loo responded, "No, I cannot tell how much yield get [sic] from that. (Sent. Tr. Vol. IV at 41). Neither Petrillo nor Blaylock testified at sentencing, nor did either offer any further evidence to rebut the government's estimation of their lab's likely actual yield.

The district court accepted Dr. Trevor's and Dr. Loo's agreed-upon estimate that Appellants' lab could have produced 25.6 grams of methamphetamine based upon a 100% theoretical yield, and applied the corresponding Base Offense Level of 26 under the United States Sentencing Guidelines ("the Guidelines"). The

district court noted that Appellants failed to present any evidence to rebut the government's estimate based upon a 100% theoretical yield.[3]

## II. STANDARD OF REVIEW

Under the Guidelines, this Court reviews a district court's findings of drug quantity for the limited purpose of determining whether they are clearly erroneous. *United States v. Newsome*, 998 F.2d 1571, 1577 (11th Cir. 1993), *cert. denied*, 510 U.S. 1062, 114 S.Ct. 734, 126 L.Ed.2d 698, *and cert. denied*, ___ U.S. ___, 114 S.Ct. 737, 126 L.Ed.2d 700 (1994); *United States v. Davis*, 902 F.2d 860, 861 (11th Cir. 1990). The clearly erroneous standard also applies to this Court's review of a district court's estimate of the production capability of a drug manufacturing operation. *Newsome*, 998 F.2d at 1577. However, we review *de novo* a district court's legal interpretation of the Guidelines. *United States v. Rodriguez*, 992 F.2d 295, 296 (11th Cir. 1993).

## III. DISCUSSION

Appellants contend that the district court committed clear error by 1) using a 100% theoretical yield to estimate that Appellants's lab could have produced 25.6 grams of methamphetamine, and 2) shifting the burden of proof to defendants to

---

[3] It is worth noting that the district court felt comfortable with its estimate of drug quantity in part because "the actual yield of this laboratory would have to drop below a 40 percent capacity before you would even move outside a base offense level of 26." (Sent. Tr. Vol. IV at 52).

produce evidence of the proper estimate of drug manufacturing capability under the Guidelines. The Court finds no merit in Appellants' arguments, but will discuss each in turn.

A. The District Court's Estimate of Appellants' Lab's Production Capability

Appellants do not dispute the fact that they were operating the methamphetamine laboratory in question, nor do they dispute the quantity of precursor chemicals they are accused of possessing. Appellants' sole argument here is that the district court committed clear error by basing its estimate of drug quantity upon insufficient evidence. In essence, Appellants object to the district court's adoption of Dr. Trevor's and Dr. Loo's estimates, both of which were based upon a 100% theoretical yield.

Under the Guidelines, where "there is no drug seizure or the amount seized does not reflect the scale of the offense, the court shall approximate the quantity of the controlled substance." USSG §2D1.1, comment. (n.12). In making such an estimate, the sentencing court may consider as evidence "the size or capability of any laboratory involved." *Id.*; *see also* USSG § 6A1.3(a) (in resolving disputed sentencing factors, district court may consider any information with sufficient indicia of reliability to support its probable accuracy). In the case of methamphetamine laboratories, this Court has held that the district court may

8

estimate the lab's capability by calculating the potential methamphetamine yield based upon seized precursor chemicals. *See, e.g., United States v. Carroll*, 6 F.3d 735 (11th Cir. 1993), *cert. denied*, 510 U.S. 1183, 114 S.Ct. 1234, 127 L.Ed.2d 577 (1994). Such estimates of methamphetamine production may be based upon the most abundant precursor available. *United States v. Smith*, 240 F.3d 927 (11th Cir. 2001).

When estimating the potential methamphetamine yield based upon precursor chemicals, the district court must make an estimation that is "reasonably fair, accurate, and conservative, and not merely speculative." *United States v. Zapata*, 139 F.3d 1355, 1359 (11th Cir. 1998). The question presented here by Appellants is whether the district court may base its estimation of drug quantity in a methamphetamine laboratory case solely upon application of a 100% theoretical yield to the relevant precursor. This Court has previously answered that question in the affirmative. In *United States v. Ramsdale*, 61 F.3d 825, 831 (11th Cir. 1995), the only evidence before the district court concerning the defendants' methamphetamine lab's production capabilities was the testimony of a DEA forensic chemist, who based his estimated yield upon a 100% theoretical yield. The defendants appealed the district court's reliance upon this expert estimate, but this Court held that "[i]n light of the lack of evidence to the contrary, we cannot

9

say that the district court clearly erred in adopting [the government's estimate]." *Id.* It is thus the rule in this circuit that a district court may base its estimate of actual methamphetamine yield upon an expert's calculation of the 100% theoretical yield, at least where there is no evidence presented by the defendants to rebut such an estimate.

In sentencing Appellants, the district court was presented with sufficient evidence upon which to estimate the potential yield of Appellants' methamphetamine lab. First, the government's expert, DEA forensic chemist Dr. Trevor, testified that based upon the equipment and precursors found at the lab, and the method of manufacture employed by Appellants, her best estimate was that a 100% theoretical yield would have produced up to 25.6 grams of methamphetamine. Furthermore, Appellants' own expert, Dr. Loo, corroborated Dr. Trevor's estimate. Appellants thereafter failed to rebut this uncontroverted testimony by, for example, presenting evidence that their own inexperience as methamphetamine producers, the weather on the day of production, or their lack of proper equipment would have produced an actual yield of less than that estimated by the experts.

The district court thus had before it the unrebutted expert testimony of two chemists, both of whom estimated that Appellants' lab could have produced up to

25.6 grams of methamphetamine. Pursuant to this Court's decision in *Ramsdale*, the district court then properly used this evidence to itself estimate the drug quantity necessary for application of the Guidelines. Because the district court's estimate was based upon the evidence in the record, and Appellants failed to rebut that evidence, this Court cannot find that the district court's factual findings with respect to drug quantity were clearly erroneous.

B. The District Court's Alleged Shifting of the Burden of Proof

Appellants argue that the district court erroneously shifted the burden of proof with respect to drug quantity, allegedly requiring Appellants to prove the appropriate estimate under the Guidelines. This argument has no merit.

The burden of proof rests with the government to prove drug quantity by a preponderance of the evidence. *See, e.g., United States v. Bogusz*, 43 F.3d 82, 87-88 (3rd Cir. 1994). However, this Court has consistently held that where the government's estimation of drug quantity is not rebutted by the defendant, the district court does not commit clear error by basing its own estimation of drug quantity solely upon the evidence introduced by the government. *See Ramsdale*, 61 F.3d at 831; *Newsome*, 998 F.2d at 1577-78.

Appellants object to the statement by the district court that "what is lacking in the record before this court is any evidence, factual evidence, as to those factual

matters which this court views as a burden of proof imposed upon defendants and not the government." (Sent. Tr. Vol. IV at 51). When read in its context, however, the district court was clearly stating that the defendants had not met their burden of coming forward with evidence to rebut the government's evidence of drug quantity. Leading up to this statement, the district court recognized that the government had presented "a good bit of testimony" concerning the proper drug quantity calculation, but that there was no further evidence concerning, *inter alia*, "the presence or absence of specialized equipment, the skill of chemist, the temperature and humidity of the atmosphere on the date and at the place chemical reactions were attempted." *Id.* The court then noted, as quoted in the passage objected to by Appellants, that Appellants had failed to present evidence of the above-listed factors, and most importantly went on to state that such evidence rested *solely with Appellants*. The district court went on: "The government has no knowledge of such matters beyond what it has presented to this court. Such variable – factual variables lay to the – within the competence and knowledge of the defendants." *Id. at 51-52*.

It is thus clear from the context of the district court's statement that it was not in fact shifting the government's burden of proving drug quantity to Appellants, but was rather stating that Appellants had failed to fulfill their burden

of coming forward with rebuttal evidence concerning the circumstances of the operation and relative skill of its operators - such evidence being only in the possession of Appellants. Thus although the district court mistakenly used the term "burden of proof," it was not in any real sense applying any such thing to Appellants. This Court is thus confident that the burden of proof with respect to drug quantity was at all times correctly placed upon the government in this case.

## IV. <u>CONCLUSION</u>

For the reasons stated herein, the sentences imposed by the district court upon Appellants Petrillo and Blaylock under Count II of the superseding indictment are AFFIRMED.

COX, Circuit Judge, dissenting:

I dissent. I disagree with the majority's application of *United States v. Ramsdale*, 61 F.3d 825 (11th Cir. 1998) to the facts of this case. *Ramsdale* held that it is not clear error to conclude that estimates of actual yield based on a one hundred percent theoretical yield satisfy the government's burden of establishing drug quantity by a preponderance when no other evidence relating to actual yield is presented. *Ramsdale*, 61 F.3d at 831. The logic of *Ramsdale* is simply that some evidence can establish that a fact is more likely true than not when there is no evidence to the contrary.[4]

In this case, the Government's expert, a chemist with the Drug Enforcement Administration's Forensic Laboratory, testified that the theoretical yield calculation does not and cannot account for the many factors that determine actual yield. She also testified that there was no feasible methodology for calculating actual yield from the evidence the laboratory possessed, and that the factors that make actual yield less than theoretical yield, including the competency of the operator and the purity of the reagents, could have affected actual yield here. The

---

[4] Of course, questionable or inconclusive evidence standing alone does not meet the preponderance standard. *See* MCCORMICK'S HANDBOOK OF THE LAW OF EVIDENCE § 339 (Edward W. Cleary et al. eds., 3d ed. 1972). For this reason, *United States v. Ramsdale*, 61 F.3d 825 (11th Cir. 1995) did not decide that the government carries its burden of persuasion as to drug quantity merely because the defendant does not come forward with rebuttal evidence. The government's own uncontradicted evidence must itself satisfy the preponderance standard.

defense expert concurred in this assessment. Further, in response to a question from the sentencing judge, the Government's chemist testified that the actual yield could have been anywhere from one percent to one hundred percent of the theoretical yield.[5] Thus, as ample evidence existed to cast doubt upon the theoretical yield figure, *Ramsdale* does not decide this case. Because both of the chemists who testified refused to express an opinion as to the actual yield, and both rejected the use of the theoretical yield as a basis for estimating the actual yield, I cannot conclude that the Government has met its burden of proving drug quantity by a preponderance of the evidence.

---

[5] The Government contends that because facts relating to the capacity of the lab are peculiarly within the knowledge of the defendants, once evidence of theoretical yield is presented the burden shifts to the defendant to present rebuttal evidence regarding actual yield. Neither *Ramsdale* nor other case law supports this contention. In any event, that it is not always the case that defendants will be in sole possession of the relevant proof is apparent from the facts here. The forensic chemist presented by the Government testified that DEA agents discarded evidence that could have provided the sentencing court with an actual yield figure, at least for that particular batch.